**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

**RENNE PUBLIC LAW GROUP**
Louise H. Renne (SBN 36508)
  lrenne@publiclawgroup.com
Ruth M. Bond (SBN 214582)
  rbond@publiclawgroup.com
Ann M. Ravel (Of Counsel) (SBN 62139)
  ann.ravel@gmail.com
350 Sansome Street, Suite 300
San Francisco, California 94101
Telephone:  (415) 848-7200
Facsimile:   (415) 848-7230

*Attorneys for Plaintiff Frank Falat*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| FRANK FALAT, derivatively on behalf of MONSTER BEVERAGE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>RODNEY CYRIL SACKS, HILTON HILLER SCHLOSBERG, GUY P. CARLING, THOMAS J. KELLY, EMELIE C. TIRRE, MARK J. HALL, KATHLEEN E. CIARAMELLO, GARY P. FAYARD, JEANNE P. JACKSON, STEVEN G. PIZULA, BENJAMIN M. POLK, SYDNEY SELATI, MARK S. VIDERGAUZ, and DOES 1–10,<br><br>Defendants,<br><br>– and –<br><br>MONSTER BEVERAGE CORPORATION,<br><br>Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# Table of Contents

I.      INTRODUCTION .................................................................................1

II.     NATURE AND SUMMARY OF THE ACTION ....................................4

III.    JURISDICTION AND VENUE ..................................................16

IV.     INTRADISTRICT ASSIGNMENT ...........................................17

V.      THE PARTIES ...........................................................................17

     A.     Plaintiff ............................................................................17

     B.     Nominal Defendant ..........................................................17

     C.     Executive Officer Defendants ...........................................18

     D.     Director Defendants .........................................................20

     E.     Doe Defendants ................................................................24

     F.     Unnamed Participants ......................................................25

VI.     RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL
DEFENDANTS...............................................................................25

     A.     Responsibilities of the Individual Defendants .............................25

     B.     The Company's Code of Business and Ethics States that
Diversity of the Company's Employees, Officers, and
Directors is A "Tremendous Asset" ...............................................30

     C.     The Charter of Monster's Nominating & Corporate
Governance Committee Says the Company Considers
Racial and Ethnic Diversity When Nominating Directors.........31

     D.     Fiduciary Duties of the Individual Defendants............................32

     E.     Breaches of Fiduciary Duties by the Individual Defendants.....33

SHAREHOLDER DERIVATIVE COMPLAINT

F.   Conspiracy, Aiding and Abetting, and Concerted Action ........34

G.   The Directors' Roles and Committees at Monster ......................36

VII.  SUBSTANTIVE ALLEGATIONS .............................................................36

A.   Monster Has Falsely Represented That It Has Made
     Substantial Progress Towards Diversity and Inclusion in
     Its Workplace and on the Board and That the Diversity It
     Has Allegedly Achieved Is a "Tremendous Asset" ...................37

B.   The Nominating and Governance Committee is
     Responsible for Nominating Individuals to the Company's
     Board ........................................................................................41

C.   At All Relevant Times, the Individual Defendants Have
     Had Actual Knowledge That, Contrary to Its Public
     Statements, Monster Was Not Achieving Success with
     Respect to Diversity, Inclusion, and the Company's
     Supposed Zero Tolerance Policy Regarding Sexual
     Harassment and Discrimination ....................................................46

D.   Facts Demonstrate the Board Had Knowledge That, Far
     From Enforcing the Company's Supposed "Zero
     Tolerance" Policy Regarding Sexual Harassment and
     Discrimination, the Company Fostered and Condoned a
     Testosterone-Charged Culture Which Protected Male
     Executives Who Engaged in Rampant Sexual Harassment,
     While at the Same Time Retaliating Against Female
     Workers Who Reported Harassment ...........................................59

E.   Background of Additional Disclosures Mandated by the
     SEC in Proxy Statements Relating to the Process by Which
     Individuals Are Nominated to the Boards of Directors of
     Publicly-Traded Companies .........................................................70

F.   False and Misleading 2019 and 2020 Proxy Statements
     Approved by the Director Defendants ..........................................80

ii

G.   Monster's Nominating and Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board ....................................106

H.   The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination................................110

I.   The Unjust Compensation Awarded to Defendants Sacks and Schlosberg....................................................................112

VIII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES......114

IX.   DEMAND FUTILITY ....................................................................115

A.   Demand on the Board is Excused as Futile ...............................116

B.   Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising from Their Misconduct ...............................118

C.   The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith.............................................................121

X.   CAUSES OF ACTION.................................................................122

XI.   PRAYER FOR RELIEF ...............................................................129

iii

Plaintiff Frank Falat ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendant Monster Beverage Corporation ("Monster" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act") and breaches of fiduciary duties.  In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to himself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by his counsel, which include a review of legal and regulatory filings, press releases, analyst reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    INTRODUCTION

"The diversity of the Company's employees, officers and directors is a tremendous asset."[1]

"Monster Energy is a global company, and wherever we operate, and across every part of the business, we strive to create an inclusive culture in which differences are recognized and valued. … We seek to capture diversity in our candidates, including diversity of gender, race and ethnicity, and veteran status."[2]

---

[1] Code of Business Conduct and Ethics, Monster Beverage Corp., available at https://investors.monsterbevcorp.com/static-files/2cb26535-baa4-4101-9a1e-d1b24af8ec27, last visited Aug. 24, 2020.

[2] *See* https://www.monsterbevcorp.com/team.php, last visited August 17, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

1.     Despite Monster's statement that it is committed to diversity and inclusion, Monster has failed to create any diversity at the very top of the Company — the Board of Directors (the "Board").  The Monster Board has lacked diversity at all relevant times, and is one of the few publicly-traded companies without a single African American director.

2.     Back in the 1960s, almost every corporate board looked like the following:



Board of directors attend a meeting in 1960. CENTRAL PRESS GETTY.

3.     While most of corporate America has made substantial progress in diversification since the 1960s, Monster still does not have a single African American on its Board.  The following are the current members of the Board:

///

///

SHAREHOLDER DERIVATIVE COMPLAINT

| Kathleen E. Ciaramello Director | Gary P. Fayard Independent Director | Mark J. Hall Director |
|---|---|---|
| | | |

| Jeanne P. Jackson Director | Steven G. Pizula Director | Mark S. Vidergauz Lead Independent |
|---|---|---|
| | | |

| Rodney C. Sacks Chairman & Chief Executive Officer | Hilton H. Schlosberg Vice Chairman, President, COO, CFO & Secretary | |
|---|---|---|
| | | |

4.     At Monster, it is not just the Board that lacks any African American individuals; there are no African Americans among the

3

Company's senior executives:

| **Rodney Cyril Sacks**<br>Chairman & CEO | **Hilton Hiller Schlosberg**<br>Vice Chairman, President, COO, CFO & Secretary | **Emelie C. Tirre**<br>President-America Region |
| --- | --- | --- |
|  |  |  |

## II.     NATURE AND SUMMARY OF THE ACTION

5.      Monster's Directors, wishing to avoid public backlash, have repeatedly made misrepresentations in the Company's public statements by claiming to have a policy of being committed to diversity and inclusion at the Company.

6.      In reality, though, Monster's Board and senior executive officers remain devoid of any Blacks and any meaningful representation of other minorities, and the Defendants have repeatedly resisted efforts to increase diversity at the top of the Company.

7.      Monster's top two executives are Rodney Sacks and Hilton Schlosberg, friends and fellow white billionaires from South Africa, where apartheid and racial discrimination persisted until the 1990s.

8.      At Monster, the Company's workforce and Board remain conspicuously devoid of any meaningful percentage of Black and minority individuals, despite the fact that diverse companies perform better.  *See*, *e.g.*, David Rock, "Diverse Teams Feel Less Comfortable — and That's Why

4

They Perform Better," HARVARD BUSINESS REVIEW, Sept. 22, 2016 ("a 2009 analysis of 506 companies found that firms with more racial or gender diversity had more sales revenue, more customers, and greater profits."). *See also* Christopher Mims, "What the Google Controversy Misses: The Business Case for Diversity," THE WALL STREET JOURNAL, Aug. 13, 2017 ("Research has established the business case for diversity. This isn't an argument about redressing historical inequities or even present-day fairness. More diverse companies have better financial returns, are more innovative and are just plain smarter than their more homogenous competitors").

9.      In reality, Monster has made no real efforts to promote diversity on its Board and among its senior executives.  Indeed, the word "diversity" only appears two (2) times in Monster's April 21, 2020 Proxy Statement.

10.     The Company's April 21, 2020 Proxy stated:

"In connection with the process of selecting and nominating candidates for election to the Board, the Nominating and Corporate Governance Committee reviews the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the Board. Among the qualifications to be considered in the selection of candidates, the Nominating and Corporate Governance Committee considers the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as well as such candidate's past or anticipated contributions to the

5

Board and its committees so that the Board includes members, where appropriate, with diverse backgrounds, knowledge and skills relevant to the business of the Company. ***The charter for the Nominating and Corporate Governance Committee specifically states that diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership***."

11.     Despite this affirmative statement, Monster Beverage Corporation, which was founded in 1935 as Hansen's Juices, has: (1) zero African American individuals and zero other minorities on its Board; and (2) zero African-Americans and zero other minorities among its senior executive ranks.

12.     As stated by Crystal Ashby, president and CEO of the Executive Leadership Council, an organization of black senior executives that works to increase inclusivity in business leadership: "Companies need to be intentional about increasing the diversity of their executive leadership teams.  The culture of an organization is cultivated by its leaders."

13.     As one individual aptly stated recently: "We've seen anemic progress to date but ***this is a watershed moment that must spur private and public boards into accelerated action***," says Janet Foutty, executive chair of the board for Deloitte, which has separately researched board diversity among Fortune 500 companies.[3]  Moreover, a company's statements about

---

[3] *See* Kerri Anne Renzulli, "*The 20 Largest U.S. Companies Without a Black Person on Their Board*," NEWSWEEK, June 17, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

Board diversity are highly material to investors.[4]

14.     The Director Defendants named herein all signed each of Monster's annual proxy statements.   With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements.   They failed to do so.

15.     Monster's Directors have deceived stockholders and the market by claiming to have diversity and inclusion programs that have been successful, so much so that the Company represents that diversity is a "tremendous asset" at Monster.   In doing so, the Directors have breached their duty of candor and have also violated the federal securities laws. Their conduct has also irreparably harmed Monster.

16.     Moreover, greater diversity is in Monster's own interest. Studies show that greater board diversity is associated with increased profits. *A McKinsey report found that companies with the most ethnically or culturally diverse boards worldwide were 43 percent more likely to experience higher profits*.

17.     Moreover, as one commentator has noted:

"We are a country suffering from racial inequality. And we want the inequality and suffering to end.  Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in

---

[4] *See* Arleen Jacobius, "Calpers Turns Focus to Board Diversity in Proxy Voting," PENSIONS & INVESTMENTS, Sept. 17, 2018 (in 2018, Calpers voted against 438 directors at 141 different companies based on the companies' failure to respond to Calpers' efforts to increase board diversity).

SHAREHOLDER DERIVATIVE COMPLAINT

taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers."[5]

18. In reality, contrary to the statements in the Company's Proxy Statements and Code of Business and Ethics that diversity is a "tremendous asset," Monster is a company run by white males who discriminate and demean women and minorities.

19. Monster is best known for aggressively marketing energy drinks to boys and men. "Unleash the Beast" is one slogan. Its hyper-caffeinated drinks have names like Assault and Maxx. The Company's scantily clad "Monster Girls" are used to market the Company's products.



---

[5] *See* John Streur, "*More Engagement Needed to Get Companies to Address Racial Inequality Risks and Issues*," CALVERT RESEARCH AND MANAGEMENT, June 19, 2020, available at https://www.calvert.com/impact.php?post=more-engagement-needed-to-get-companies-to-address-racial-inequality-risks-and-issues-&sku=35910, last visited June 29, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

20. In 2018, five former female employees of Monster sued the Company over its discriminatory, abusive culture. One of the women was Sara Rabuse, who worked as a make-up artist at Monster. She sued Monster and one of its executives, Brent Hamilton, who choked her, bit her thumb, and pulled her hair so violently that clumps of her hair came out. The two were in Tennessee in 2016 for work on behalf of Monster at the Country Music Awards. As an article describing Hamilton's disgusting and demeaning conduct noted: "Rabuse had red marks around her neck from Hamilton trying to strangle her, according to the police report. Her thumb was bloody from where Hamilton bit her. Her nails were broken from fighting him off."[6] Hamilton was arrested, and Rabuse was hospitalized after a hotel guest found her crumpled on the floor of their room.

21. Amazingly, for over three years, including even as he awaited a criminal trial for strangling Ms. Rabuse during the business trip in 2016, Brent Hamilton was still allowed to keep his job as the Head of Music Marketing at Monster. And after he strangled and bit Rabuse, Hamilton continued to sexually harass women at Monster. It was only after he was caught sending sexually explicit texts to a co-worker that Hamilton was finally let go in 2019.

/ / /

/ / /

---

[6] *See* Emily Peck, "5 Women Sue Monster Energy Over Abusive, Discriminatory Culture," HUFFINGTON POST, Jan. 23, 2018.

9

SHAREHOLDER DERIVATIVE COMPLAINT



DAVIDSON COUNTY COURT -- Brent Hamilton on the night he was arrested in 2016.

22.    Monster stood by Hamilton, even after his arrest.  Hamilton was allowed to keep his job while Rabuse lost hers.  "My impression was they weren't taking things seriously. Or my allegations seriously," said Rabuse.[7]

23.    According to the women who have sued Monster, Brent Hamilton's conduct was by no means an exception.

24.    John Kenneally was also allowed to remain a Vice President at Monster despite three women accusing him of bullying, harassment and retaliation. The women alleged that Kenneally actively undermined their reputations and forced them out of the Company. The Huffington Post obtained text messages he sent to one of these women (Paige Zeringue), in

---

[7] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

which he described her as a "whore," made a racially charged comment about "black dicks," and used the term "bitch" to refer to both her and another female employee.[8]  Zeringue told ABC News that she was initially in a consensual sexual relationship with her former boss at the Company, John Kenneally.

25.    After beginning their relationship, Zeringue was promoted twice by Kenneally. But later Kenneally threatened to fire her if she broke up with him.

26.    "I realized very soon that it was absolutely the worst mistake of my life," Zeringue said.[9]  She added that she told him she wanted out of the relationship, and angry texts and verbal abuse soon followed.  "He would call me names, and things that no one in my life would ever call me," she said. "He would call me a whore."

27.    Another former employee, Fran Pulizzi, told ABC News that she had heard Kenneally call *another* female employee a "whore."[10]  "And it wasn't uncommon for him to discuss sexual relations among employees," Pulizzi added.

28.    Pulizzi also alleged that she faced unlawful retaliation by Monster executives after she participated in an internal investigation at Monster where she was promised that her comments would be treated

---

[8] *See* Emily Peck, "5 Women Sue Monster Energy Over Abusive, Discriminatory Culture," HUFFINGTON POST, Jan. 23, 2018.

[9] *See* Catherine Thorbecke, "Women Suing Monster Energy Share Stories of Alleged Discrimination, Harassment," ABC NEWS, Feb. 4, 2018, available at https://abcnews.go.com/GMA/News/women-suing-monster-energy-share-stories-alleged-discrimination/story?id=52746025, last visited Aug. 24, 2020.

[10] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

confidentially.  Pulizzi alleged in a lawsuit she filed against Monster that after she had been working at the Company for five years, she was subjected to hostile and harassing behavior from Kenneally when she participated in an investigation by HR into another employee's sexual harassment complaint.  "I thought for sure they were going to keep my statements confidential," Pulizzi said. "When I found out within a few days that John had been made aware of everything I said, I was in shock."

29.    Pulizzi alleges that Kenneally then began to bully and harass her at work before ultimately freezing her out.  "He refused to talk to me, and our open communication was a key part of my job," she said. "He refused to work with me, refused to acknowledge me."[11]

30.    Another former employee, Jamie Hogan, argued in court documents filed in August 2017 that her former supervisor at Monster would "publicly insult and berate her for having children." "He would make comments about, 'Oh, we'd have to move our meeting so that Jamie could go home at night and see her kids,'" Hogan told ABC News.[12]  She added that he would also schedule "impromptu meetings." "I didn't show up because I wasn't aware of it," she said. "It just became increasingly difficult to do my job."

31.    Hogan said she felt retaliated against after she reported her concerns to the human resources department, and eventually left the Company.

32.    Female employees at Monster have also alleged they were paid

---

[11] *Id.*
[12] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

less than men and passed over for promotions.   While underpaying minorities and women, Monster's CEO and executives have used the money saved to pay themselves huge amounts.   *In fiscal year 2019, the Company paid its CEO, Rodney C. Sacks, total compensation of $13,982,434; its CFO, COO, President, Secretary and Director, Hilton H. Schlosberg, total compensation of $13,939,299; and its President, EMEA, Guy P. Carling, total compensation $1,885,951.   In fiscal year 2018, the Company paid Rodney Sacks total compensation of $13,914,931; Hilton Schlosberg total compensation of $13,885,207, and Guy Carling, total compensation of $3,039,171*.

33.   As set forth below, Defendants' conduct constitutes bad faith and disloyal conduct, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Monster.  As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

34.   The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing.   Courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

SHAREHOLDER DERIVATIVE COMPLAINT

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).   As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions.  *See* 1 Cal. 3d 93, 107 (1969).  The courts of Delaware, Monster's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), ov*erruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

35.     Plaintiff, derivatively on behalf of Monster, seeks the following relief from the Director Defendants:

(a)     The Company should immediately create a substantive plan for diversity and inclusion for the Board, upper management levels, and throughout the corporation with the authority to implement such a plan;

(b)   The Company should replace its Human Resources director, who has allowed unlawful sexual harassment and discrimination, and retaliation for reporting the wrongdoing, to persist for years, and the Company should eliminate mandatory arbitration and confidentiality agreements pertaining to claims of sexual harassment and discrimination;

(c) At least one of Monster's directors should immediately resign prior to the Company's annual meeting set for April 2021

14

and a Black person nominated to the Board at that time. Thereafter, within a year and prior to the next annual meeting at least one other person from an underrepresented community should be nominated to the Board;

(d)    All Director Defendants named in this suit should return all of their 2020 compensation received from Monster (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Blacks and minorities in corporate America;

(e)    Monster should agree to publish an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Monster;

(f)    Monster should create a $800 million fund to hire Blacks and minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at Monster for minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(g)    Monster should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(h)    Monster should establish a Board-level Diversity Equity and Inclusion Council;

(i)    Monster should establish the position of a Chief Diversity Officer who reports directly to the Board; and

SHAREHOLDER DERIVATIVE COMPLAINT

(j)     Monster should immediately set specific goals with respect to the number of Blacks and minorities to hire at the Company over the next five years, and Monster should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

36.     The Individual Defendants' misconduct has caused severe financial and reputational damage to Monster.

## III.   JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.   The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.   The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

38.     This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

39.     This Court has jurisdiction over Defendants.  Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.   Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of

SHAREHOLDER DERIVATIVE COMPLAINT

interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  The Court has jurisdiction over Monster because the Company was headquartered in Corona, California for the time relevant to this complaint and has substantial business operations in California.

40.    Venue is proper in this District pursuant to Section 27 of the Exchange Act.  Venue is also proper under 28 U.S.C. § 1391(b) because many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District, and many of the Defendants reside in this District.

## IV.    INTRADISTRICT ASSIGNMENT

41.    Plaintiff requests that this action be assigned to the Southern Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Orange, California and a substantial number of Defendants are residents of Orange County, California.

## V.    THE PARTIES

### A.    Plaintiff

42.    Plaintiff is a current shareholder of Monster, and has continuously held Monster stock at all relevant times.  Plaintiff is a citizen of Oregon.

### B.    Nominal Defendant

43.    Monster Beverage Corporation is a holding company, which engages in the development, marketing, sale and distribution of energy drink beverages and concentrates. It operates through the following segments: Monster Energy Drinks, Strategic Brands and Other. The Monster

SHAREHOLDER DERIVATIVE COMPLAINT

Energy Drinks segment sells ready-to-drink packaged energy drinks to bottlers and full-service beverage distributors. The Strategic Brands segment sells concentrates and beverage bases to authorized bottling and canning operations. The Other segment comprises of certain products sold by its subsidiary, American Fruits and Flavors LLC to independent third-party customers. The Company was founded on April 25, 1990, is a Delaware Corporation, and is headquartered in Corona, California.

### C. Executive Officer Defendants

44.    Defendant Rodney Cyril Sacks is a white billionaire from South Africa and a close confidant and business partner of Defendant Schlosberg. He has served as Chairman of the Board of the Company, Chief Executive Officer and a director of the Company from November 1990 to the present. He is a member of the Executive Committee of the Board (the "Executive Committee") since October 1992 and serves as Chairman of the Board of Directors and a director of Monster Energy Company ("MEC").  Sacks has led the Company for over 30 years. Sacks is a resident of Laguna Beach, California, in Orange County, California.

45.    Defendant Hilton Hiller Schlosberg is a white billionaire from South Africa and a close confidant and business partner of Defendant Sacks. He has served as Vice Chairman of the Board of the Company, President, Chief Operating Officer, Secretary and a director of the Company from November 1990 to the present. He has served as Chief Financial Officer of the Company since July 1996, a member of the Executive Committee since October 1992, and Vice Chairman, President, Chief Financial Officer and a director of MEC.  Schlosberg has held senior leadership positions with the Company for over 30 years, and has been the Company's Chief Financial Officer for 23 years.

SHAREHOLDER DERIVATIVE COMPLAINT

46.    Defendant Guy P. Carling has served as President of EMEA since 2018.   In his position as President of EMEA, Carling oversees the Company's sales, development and expansion in markets in Europe, the Middle East, Africa, and Central Asia, and frequently reports directly to the Executive Committee and the Board of Directors. Carling joined MEC in December 2007, and previously served as Chief Commercial Officer & Managing Director of EMEA. Carling has worked in the beverage business for over 22 years.  He is a resident of London, England.

47.    Defendant Thomas J. Kelly has served as Executive Vice President, Finance, and/or Controller and Secretary of MEC since 1992.  In his position as Executive Vice President, Finance, Mr. Kelly frequently reports directly to the Executive Committee and the Board of Directors. Prior to joining MEC, Kelly served as controller for California Copackers Corporation.   Kelly is a Certified Public Accountant (inactive) and has worked in the beverage business for over 34 years.  He is a resident of San Diego County, California.

48.    Defendant Emelie C. Tirre has served as President of the Americas since July 2018.  In her position as President of the Americas, Tirre oversees the Company's sales, development and expansion in markets in the United States, Canada, Latin America, Oceania and the Caribbean. She frequently reports directly to the Executive Committee and the Board of Directors.  Tirre joined MEC in July 2010, and previously served as Chief Commercial Officer and the Senior Vice President of Sales for North America.  Tirre has worked in the beverage business for over 28 years.  She is a resident of Laguna Beach, California in Orange County, California.

/ / /

/ / /

19

SHAREHOLDER DERIVATIVE COMPLAINT

### D.    Director Defendants

49.    Defendant Mark J. Hall has served as a Director of the Company since January 1, 2014 and an employee of MEC focusing on ideation, design and development of new products since May 1, 2017.  He has also served as Chief Marketing Officer of MEC from January 2015 to May 1, 2017, Chief Brand Officer of MEC from January 2014 to December 2014, and President of the Monster Beverage Division from January 2007 to December 2013. Hall joined MEC in 1997 as a Senior Vice President. Prior to joining MEC, Mr. Hall was employed by the Arizona Beverage Co. as Vice President of Sales, where he was responsible for sales and distribution of products through a national network of beer distributors and soft drink bottlers in the United States.   Hall has detailed knowledge of and valuable perspectives and insights into both the business and the beverage business in general.  Hall is a resident of San Diego County, California.

50.    Defendant Kathleen E. Ciaramello has served as a Director of the Company since June 2019, and President of Foodservice and On-Premise Business Unit of The Coca-Cola Company from 2013 to the present. Ciaramello joined The Coca-Cola Company in 1985 and has served in various account management, sales and marketing roles of increasing responsibility, including Group Vice President, Strategic Partnership Marketing from 2006 to 2009 and Vice President East Zone from 2009 to 2013, as well as one of the inaugural members of Coca-Cola's Women's Leadership Council.  Ciaramello has served on the Board of Directors and other various roles of the National Restaurant Association since 2016, the Women's Foodservice Forum Board of Directors since 2016, and the Board of Directors of the Jack & Jill Late Stage Cancer Foundation. Ciaramello is European Refreshments' (an indirect wholly-owned subsidiary of The Coca-Cola Company) designee to the Board. Ciaramello has substantial business

SHAREHOLDER DERIVATIVE COMPLAINT

and leadership experience in the beverage industry. She is a resident of Georgia.

51.     Defendant Gary P. Fayard has served as a Director of the Company since June 2015, and a member of the Audit Committee of the Board (the "Audit Committee") since February 2016.  He has also served as Executive Vice President and Chief Financial Officer of The Coca-Cola Company from February 2003 to April 2014.  Fayard joined The Coca-Cola Company in 1994, and in July 1994, he was elected Vice President and Controller, a position he held until December 1999 when he was elected Senior Vice President and Chief Financial Officer.  Fayard has also served on the board of directors of Coca-Cola FEMSA, S.A.B. de C.V., the largest bottler in the world of Coca-Cola trademark beverages by unit case volume operating in territories in Mexico, Central and South America and the Philippines, from 2004 to March 2016. Fayard has been on the board of directors of Genuine Parts Company since 2014.  Fayard has a background in accounting and finance.  He is a resident of Tennessee.

52.     Defendant Jeanne P. Jackson has served as a Director of the Company since June 2019.  At Nike, Inc., Jackson served as President and Senior Strategic Advisor to the Chief Executive Officer from June 2016 to August 2017, President of Product & Merchandising from July 2013 to April 2016, and President of Direct to Consumer from March 2009 to July 2013. She also served as a Director of Delta Air Lines, Inc. since January 2017 and director of The Kraft Heinz Company since July 2015 (previously director of Kraft Foods Group, Inc. from October 2012 to July 2015). Jackson has previously served on the boards of McDonald's Corporation, Nike, Inc., Nordstrom, Inc., Williams-Sonoma, Inc., Motorola Mobility Holdings, Inc., Harrah's Entertainment Inc. and others. Jackson is the founder of MSP

SHAREHOLDER DERIVATIVE COMPLAINT

Capital and served as its Chief Executive Officer from 2002 to 2009, and is again serving as its Chief Executive Officer from 2017 to present. Jackson has served in senior leadership roles in many organizations, including Wal-Mart.com USA, LLC, the Gap, Inc., Banana Republic, Victoria's Secret, Saks Fifth Avenue, Walt Disney Attractions, Inc. and Federated Department Stores, Inc.  Jackson brings knowledge and experience of over thirty years as a senior executive and director in an array of large, public companies.  She is a resident of Orange County, California.

53.    Defendant Steven G. Pizula has served as a Director of the Company and member of the Audit Committee since June 2019, and a Partner at Deloitte & Touche LLP from September 1977 to June 2018.  Since joining Deloitte & Touche LLP (then Haskins & Sells) in 1977, Pizula served as the supervising audit partner on a number of large, multinational public companies in a wide range of industries, including consumer products. Pizula held various leadership positions at Deloitte & Touche LLP, most recently as Practice Growth Leader for the Pacific Southwest Region and as a Member of the National Committee for Audit Quality, and National Partner Admissions Committee.  Pizula is currently a board member of The Whittier Trust Company, the Arnold and Mabel Beckman Foundation and the Forum for Corporate Directors.  Pizula is a Certified Public Accountant and member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.  Pizula brings extensive experience in accounting and audit matters. He is a resident of Irvine, California, in Orange County, California.

54.    Defendant Benjamin M. Polk has served as a Director of the Company since November 1990, member of the Nominating and Corporate Governance Committee since June 2019 (Chairman since June 2019), and

SHAREHOLDER DERIVATIVE COMPLAINT

member of the Compensation Committee since June 2019.  He has served as a Director of MEC from July 1992 to February 2016 and a Partner with Veritas Capital, a private equity firm, since July 2011.  Additionally, Polk has served as a Director of Aeroflex Holding Corp. from November 2012 to September 2014, Director of CPI International, Inc. from October 2012 to July 2017, and a Director of Truven Health Analytics, Inc. from October 2012 to April 7, 2016.  Polk was a partner with the law firm of Schulte Roth & Zabel LLP from May 2004 to July 2011 and prior to that, a partner with the law firm of Winston & Strawn LLP, where Polk practiced law with that firm and its predecessor firm from August 1976 to May 2004.  Polk has gained detailed knowledge of the Company during his service as a director since 1990 and as outside counsel from 1990 to July 2011. Polk has extensive experience in matters relating to mergers, acquisitions and corporate finance.  He is a resident of New York.

55.    Defendant Sydney Selati has served as a Director of the Company and member of the Audit Committee since September 2004 (Chairman since February 2015), a member of the Compensation Committee of the Board (the "Compensation Committee") since March 2007, and member of the Nominating and Corporate Governance Committee since April 2009. Selati was a director of the San Diego Jewish Community Foundation from July 2010 to June 2017 and was Chairman of its Audit Committee from August 2011 to June 2019.  Selati was Chairman of the board of directors of the San Diego Jewish Community Foundation from July 2016 to June 2017. Selati was a director of Barbeques Galore Ltd. from 1997 to 2005 and was President and Chairman of the board of directors of The Galore Group (U.S.A.), Inc. from 1988 to 2005. Selati was President of Sussex Group Limited from 1984 to 1988.  Selati has extensive experience as

SHAREHOLDER DERIVATIVE COMPLAINT

a chief executive and board member of companies in other industries, which allows him to bring additional perspective to the Board. Selati is a Chartered Accountant (South Africa). He is a resident of La Jolla, California, in San Diego County, California.

56. Defendant Mark S. Vidergauz has served as a Director of the Company and member of the Compensation Committee since June 1998 (Chairman since June 2019), a member of the Audit Committee from April 2000 through May 2004, a member of the Nominating and Corporate Governance Committee since June 2019, and Lead Independent Director since March 2014. He has also served as Chief Executive Officer of The Sage Group LLC, an investment banking firm, from April 2000 to the present. The Sage Group, LLC provides merger, acquisition and capital formation advisory services to a wide range of companies in the consumer sector. He was the Managing Director at the Los Angeles office of ING Barings LLC, a diversified financial service institution headquartered in the Netherlands, from April 1995 to April 2000. Vidergauz brings strong merger and acquisition, corporate finance, corporate governance and leadership experience to the Board. He is a resident of Los Angeles, California.

57. The defendants identified in paragraphs 43 through 47 are referred to herein as the "Executive Officer Defendants." The defendants identified in paragraphs 48 through 55 are referred to herein as "Director Defendants." The defendants identified above are referred to collectively herein as the "Individual Defendants."

### E. Doe Defendants

58. Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 10, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names. Following further

SHAREHOLDER DERIVATIVE COMPLAINT

investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are Monster officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

### F.     Unnamed Participants

59.     Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit Defendants and themselves to the detriment of Monster.

## VI.   RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Responsibilities of the Individual Defendants

60.     Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

61.     Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

62.     The Company's corporate governance guidelines state:

The Board is elected by the stockholders to oversee their interest in the long-term health and overall success of the business and its financial strength. The Board serves as the ultimate decision-

SHAREHOLDER DERIVATIVE COMPLAINT

making body of the Company, except for those matters reserved to or shared with the stockholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.

63.     Monster also states that:

The following are the Board's primary responsibilities, some of which may be carried out by one or more committees of the Board or the independent directors, as appropriate:

a. Exercise business judgment to act in what it reasonably believes to be in the best interests of the Company and its stockholders.

b. Fulfill its responsibilities consistent with its fiduciary duties to the stockholders, in compliance with all applicable laws and regulations.

c. As appropriate, take into consideration the interests of other stakeholders, including employees and the members of communities in which the Company operates.

d. Provide advice and counsel to the Chief Executive Officer and other senior officers of the Company.

e. Oversee the proper safeguarding of the assets of the Company, the maintenance of appropriate financial and other internal controls, and the Company's compliance with applicable laws and regulations and proper governance.

SHAREHOLDER DERIVATIVE COMPLAINT

f.  Hire independent legal, financial or other advisors as it may deem necessary.

g.  In discharging its duties, the Board may rely on the Company's senior executives and outside advisors and auditors. Accordingly, skill and integrity will be important factors in selection of the Company's senior executives and other advisors.

h.  Devote the time and effort necessary to fulfill its responsibilities.

i.  Hold regularly scheduled meetings at least four times a year.

j.  The chairperson of the Board will provide information important to directors' understanding of issues to come before the Board or a committee of the Board sufficiently in advance of meetings to permit directors to inform themselves.

k.  Review meeting materials in advance of Board and Board committee meetings. Suggest additional topics to be included on meeting agendas by contacting the chairperson of the Board, the Lead Independent Director or the relevant Board committee chairperson.

l.  Directors are expected to attend all meetings of the Board and of the Board committees on which they serve.

27

SHAREHOLDER DERIVATIVE COMPLAINT

m. The chairperson of the Board will set the agenda for Board meetings. Any director may raise a subject that is not on the agenda at any meeting.

n. Regularly bring to the Board certain items pertinent to the oversight and monitoring function of the Board.

o. Review the Company's long-term strategic plans and the most significant financial, accounting and risk management issues facing the Company in at least one Board meeting each year.

p. Non- management directors will meet in regular executive sessions. Normally, such meetings will occur during regularly scheduled Board meetings.

q. Meetings of the non-management directors will be chaired by the Lead Independent Director.

64. The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion. As alleged herein, the Company's Board failed to act in good faith by failing to ensure compliance with these policies and controls. These policies existed on paper, but were knowingly disregarded.

65. The Company's 2020 Proxy Statement stated the following with respect to the Board's role in risk oversight:

**The Board's Role in Risk Oversight**

The Board of Directors plays an active role in overseeing and managing the Company's risks. The full Board and its

28

Executive Committee regularly review the Company's results, performance, operations, competitive position, business strategy, liquidity, capital resources, product distribution and development, material contingencies and senior personnel, as well as the risks associated with each of these matters. The Board implements its risk oversight function both as a whole and through its standing committees. Certain of the work is delegated to committees, which meet regularly and report back to the full Board. The Compensation Committee reviews the Company's compensation practices and discerns the relationship among risk, risk management and compensation in light of the Company's objectives. The Audit Committee

reviews and discusses with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and risks related to financial statements, the financial reporting process and accounting and legal matters, as well as the steps management has taken to monitor and control such exposures. The full Board also discusses risk throughout the year during meetings in relation to specific proposed actions including risks related to cybersecurity and reputation. These processes are designed to ensure that risks are taken knowingly and purposefully. The Board believes that its role in oversight of risk management (as well as the role of the Compensation Committee and the Audit Committee) has not adversely affected its leadership structure or results of operations.

SHAREHOLDER DERIVATIVE COMPLAINT

66.   The Board has obviously been aware at all relevant times that it is all-white and lacks diversity.  The Board and the Executive Officers also knew that diversity was lacking in the Company's workforce.   The Defendants' knowledge of the problems is reflected by their efforts to conceal the lack of diversity and discrimination, in its duplicitous conduct in misrepresenting to CALSTERS in 2011 that it would change the charter of the Company's Nominating & Corporate Governance Committee to state that diversity is an important goal in the Board nomination process, and in its continued resistance to adding racially and ethnically diverse candidates to its Board and senior executives.

67.   The Board's conduct represented hypocrisy, bad faith, and disloyal conduct.  The Board had a duty to cause the Company to comply with the law and its own Corporate Governance Principles, and failed to do so.

68.   The direct involvement of Monster's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability.  Demand is thus futile.

**B.   The Company's Code of Business and Ethics States that Diversity of the Company's Employees, Officers, and Directors is A "Tremendous Asset"**

69.   When a company makes specific affirmative representations, it has a duty to ensure that subsequent statements are not misleading.  With respect to Monster Beverage, the Company has repeatedly told employees, customers, and shareholders that Monster prizes diversity and is actively attempting to increase diversity.

70.    In fact, Monster has specifically stated that the diversity of its employees, officers, and directors is a "*tremendous asset*."

71.   The Board itself drafted and adopted the Code of Business and

SHAREHOLDER DERIVATIVE COMPLAINT

Ethics of Monster Beverage Corporation, which states:

> *The diversity of the Company's employees, officers and directors is a tremendous asset*.[13]

72.     Moreover, the Code of Business and Ethics is applicable to each employee of the Company, including each officer and director of the Company, and all such persons are required to acknowledge and abide by its terms:

> This Code of Business Conduct and Ethics (this "Code") has been adopted by the Board of Directors of Monster Beverage Corporation (the "Company") . . . It is applicable to all employees, officers and directors of the Company . . . Each employee is required to acknowledge this Code of Business Conduct and Ethics.[14]

**C.     The Charter of Monster's Nominating & Corporate Governance Committee Says the Company Considers Racial and Ethnic Diversity When Nominating Directors**

73.     The Charter of Monster's Nominating & Corporate Governance Committee states as follows:

> In connection with the process of selecting and nominating candidates for election to the Board, the Committee shall review the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the

---

[13] Code of Business Conduct and Ethics, Monster Beverage Corp., available at https://investors.monsterbevcorp.com/static-files/2cb26535-baa4-4101-9a1e-d1b24af8ec27, last visited Aug. 24, 2020.

[14] *Id.*

31

Board. Among the qualifications to be considered in the selection of candidates, *the Committee shall consider the following attributes and criteria of candidates: experience, knowledge, skills, expertise, diversity*, personal and professional integrity, character, business judgment, time available in light of other commitments, dedication, independence and such other factors that the Committee considers appropriate so that the Board includes members, where appropriate, with diverse backgrounds, skills and experience, including appropriate financial and other expertise relevant to the business of the Company. *Diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership*. The Committee will consider diverse candidates in the pool from which Board nominees are chosen, including, without limitation, nominees from both corporate positions beyond the executive suite and nontraditional environments.[15]

## D. Fiduciary Duties of the Individual Defendants

74. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe Monster and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Monster in a fair, just, honest, and equitable manner.

---

[15] Available at https://investors.monsterbevcorp.com/static-files/9aa8b2ab-c80a-448b-a764-7263cdb2acf0, last visited Aug. 21, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

The Individual Defendants were and are required to act in furtherance of the best interests of Monster and not in furtherance of their personal interest or benefit.

75. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Monster were required to, among other things:

(a) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how Monster conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**E. Breaches of Fiduciary Duties by the Individual Defendants**

76. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Monster, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

77. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Monster's discrimination, and caused Monster to

SHAREHOLDER DERIVATIVE COMPLAINT

incur substantial damage.

78.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Monster, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.  As a result, and in addition to the damage the Company has already incurred, Monster has expended, and will continue to expend, significant sums of money.

**F.    Conspiracy, Aiding and Abetting, and Concerted Action**

79.    At all relevant times, the Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency.   The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants.  The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

80.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at the Company and covering up discrimination

SHAREHOLDER DERIVATIVE COMPLAINT

at the Company.

82.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and caused the Company to cover up Monster executives' discrimination.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

83.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets, and to conceal adverse information concerning the Company's operations.

84.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company to cover up discrimination at the Company.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

85.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

SHAREHOLDER DERIVATIVE COMPLAINT

### G.    The Directors' Roles and Committees at Monster

86.    The following chart sets forth the directors of Monster as set forth in the Company's website and the committees on which they serve:

>> Board of Directors and Committee Composition

C = Chair   M = Member

| Name | Audit Committee | Nominating and Corporate Governance | Compensation Committee |
|---|---|---|---|
| Kathleen E. Ciaramello | | | |
| Gary P. Fayard | M | | |
| Mark J. Hall | | | |
| Jeanne P. Jackson | | | |
| Steven G. Pizula | M | | |
| Benjamin M. Polk | | C | M |
| Rodney C. Sacks | | | |
| Hilton H. Schlosberg | | | |
| Sydney Selati | C | M | M |
| Mark S. Vidergauz* | | M | C |

*Lead Independent Director

https://investors.monsterbevcorp.com/static-files/1f848283-e17d-4bba-af07-359a6a39f3f8. Last visited August, 19, 2020.

## VII.    SUBSTANTIVE ALLEGATIONS

87.    Monster Beverage Corporation is a holding company, which engages in the development, marketing, sale and distribution of energy drink beverages and concentrates. It operates through the following segments: Monster Energy Drinks, Strategic Brands and Other. The Monster Energy Drinks segment sells ready-to-drink packaged energy drinks to bottlers and full-service beverage distributors. The Strategic Brands segment sells concentrates and beverage bases to authorized bottling and canning operations. The Other segment comprises of certain products sold

36

by its subsidiary, American Fruits and Flavors LLC to independent third-party customers. The Company was founded in 1935 as Hansen's Juices, is a Delaware Corporation, and is headquartered in Corona, California.

88.     Monster's Board enjoys the undesirable distinction of having no African Americans or other minorities on its Board and among its senior executives.

89.     The lack of diversity at the top at Monster is significant.  The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors.  Diversity in the workforce is a strong indication of a lack of discrimination; conversely, a lack of diversity provides a strong indication that discrimination is present.

90.     If the Monster Board is vested with the responsibility of "Leading by Example," it has failed miserably at that role with respect to diversity; the Board still, in 2020, lacks any Black or minority individuals.

**A.     Monster Has Falsely Represented That It Has Made Substantial Progress Towards Diversity and Inclusion in Its Workplace and on the Board and That the Diversity It Has Allegedly Achieved Is a "Tremendous Asset"**

91.     Monster has represented that it promotes and achieves diversity and inclusion at the Company.  For example, the Company's website states:

*[W]e strive to create an inclusive culture in which differences are recognized and valued*. It is the Company's belief that bringing together diverse backgrounds and giving each employee the opportunity to contribute their skills, experience and perspectives develops strong and sustainable relationships throughout the organization.

37

Accordingly, *we embrace a diverse workforce and value diverse perspectives, leveraging varied thinking, skills experience and work styles. We understand that maximizing the business impact of global diversity and inclusion will empower our employees to*:

- Make good decisions and allows us to optimize resources by eliminating cultural barriers to work together effectively
- *Deliver strong performance and growth by attracting, engaging and retaining diverse talent*
- *Innovate by utilizing the diverse perspectives,* skills and experience of our employees
- Adapt and respond effectively to changes, challenges, and expectations on a global level

We are committed to equality of opportunity, and do not tolerate discrimination or harassment, particularly on the basis of race, religion, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, military or veteran status, or any other characteristics protected by federal or state law. The basis for recruitment, hiring, placement, training, compensation, and advancement should be qualifications, skills, performance, and experience.

92.    Monster's website also states:

SHAREHOLDER DERIVATIVE COMPLAINT

*We seek to capture diversity in our candidates, including diversity of gender, race and ethnicity, and veteran status. This applies across the organization, including at the senior management level.*

93.     Moreover, Monster Beverage tells its employees, customers, and shareholders that diversity is extremely important to the Company.  In fact, Monster has specifically stated that the diversity of its employees, officers, and directors is a "tremendous asset."

94.     The Board itself drafted and adopted the Code of Business and Ethics of Monster Beverage Corporation, which states:

"*The diversity of the Company's employees, officers and directors is a tremendous asset.*"[16]

95.     The Code of Business and Ethics is applicable to each employee of the Company, including each officer and director of the Company, and all such persons are required to acknowledge and abide by its terms

96.     The Individual Defendants have caused the Company to make specific, concrete statements about the Company's allegedly strong diversity efforts, but have taken no measurable actions to support these statements.

97.     The Individual Defendants have also caused Monster to represent that the Company has taken active and concerted steps to recruit African American individuals by stating that "We seek to capture diversity

---

[16] Code of Business Conduct and Ethics, Monster Beverage Corp., available at https://investors.monsterbevcorp.com/static-files/2cb26535-baa4-4101-9a1e-d1b24af8ec27, last visited Aug. 24, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

in our candidates, including diversity of gender, race and ethnicity, and veteran status."

98.    The Company's Code of Business Conduct and Ethics states:

**Diversity, Discrimination and Harassment**

***The diversity of the Company's employees, officers and directors is a tremendous asset***. The Company is firmly committed to providing equal opportunity in employment, and does not tolerate discrimination on the basis of race, religion, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, military or veteran status, or any other characteristics protected by federal or state law. Equal employment opportunity will be extended to all persons in all aspects of the employer-employee relationship, including recruitment, hiring, training, promotion, transfer, discipline and termination. ***The Company prohibits harassment of any individual*** on any of the bases listed above. ***Examples include derogatory comments based on race, gender or ethnicity and unwelcome sexual advances***.

99.    The Individual Defendants knew these statements were false and misleading.  The Defendants were well aware of the lack of diversity on the Board and among senior management, and knew that the Company's statements regarding an allegedly strong commitment to diversity were false.   The Defendants also had actual knowledge of rampant sexual harassment of women by the male executives at Monster, including the

SHAREHOLDER DERIVATIVE COMPLAINT

assault by Brent Hamilton.  Amazingly, for over three years, including even as he awaited a criminal trial for strangling Ms. Rabuse during the business trip in 2016, Brent Hamilton was still allowed to keep his job as the Head of Music Marketing at Monster Energy.  Therefore, far from having a strong policy prohibiting sexual harassment, including "unwanted sexual advances," the Defendants protected sexual predators such as Mr. Hamilton at the expense of female employees of the Company.  The Defendants' conduct represents bad faith, and disloyal conduct which cannot be indemnified by the Company.

100.   In short, the Company's affirmative statement that it has a "zero tolerance policy" regarding sexual harassment and discrimination is totally false, and the Director Defendants have known so at all relevant times because, as demonstrated herein, they have known of and have condoned rampant retaliation against female employees who report sexual harassment and discrimination, while at the same time protecting and financially rewarding the male employees who engage in the wrongful conduct.

**B.   The Nominating and Governance Committee is Responsible for Nominating Individuals to the Company's Board**

101.   In 2019 and 2020, Directors Epstein, Taber, Polk, Selati, and Vidergauz served on Monster's Nominating & Governance Committee.

102.   As set forth in the Company's Nominating and Corporate Governance Committee Charter:

**Purpose**

The purpose of the Nominating and Corporate Governance Committee (the "*Committee*") of Monster Beverage Corporation (the "*Company*") is to recommend to the Board of Directors of the Company (the "*Board*") director nominees for

41

the annual meeting of stockholders, to identify and recommend candidates to fill vacancies occurring between annual stockholder meetings.

The Committee shall have the authority to undertake the specific duties and responsibilities described hereinafter and the authority to undertake such other duties as are assigned by law, the Company's charter or bylaws, or by the Board.

**Specific Duties**

1. The Committee shall be responsible for:

(1)    making recommendations to the Board regarding the size and composition of the Board;

(2)    establishing procedures for the nomination process;

(3)    screening and recommending candidates for election to the Board;

(4)    developing and recommending to the Board criteria to identify and evaluate prospective candidates for the Board;

(5)    considering nominations of candidates for election to the Board validly made by stockholders in accordance with applicable laws, rules and regulations and provisions of the Company's charter documents;

(6)    reviewing and making recommendations to the Board regarding the status of emeritus directors;

(7)    establishing and administering an annual assessment procedure relating to the performance of both the Board as a whole and its individual members;

(8)    annually reviewing the composition of each committee and presenting recommendations for committee memberships

42

to the Board as needed;

(9) reviewing the compensation paid to non-employee directors for annual retainers (including Board and committee chairpersons) and meeting fees, if any, and making recommendations to the Board for any adjustments; provided that no member of the Committee will act to fix his or her own compensation except for uniform compensation to directors for their services as such;

(10) developing and recommending to the Board corporate governance guidelines and other corporate governance policies, and periodically reviewing these guidelines and policies, identifying best practices and recommending any changes to documents, policies and procedures in the Company's corporate governance framework, including to the Company's charter and bylaws; and

2. In connection with the process of selecting and nominating candidates for election to the Board, the Committee shall review the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the Board. Among the qualifications to be considered in the selection of candidates, the Committee shall consider the following attributes and criteria of candidates: experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments, dedication, independence and such other

SHAREHOLDER DERIVATIVE COMPLAINT

factors that the Committee considers appropriate so that the Board includes members, where appropriate, with diverse backgrounds, skills and experience, including appropriate financial and other expertise relevant to the business of the Company. Diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership. The Committee will consider diverse candidates in the pool from which Board nominees are chosen, including, without limitation, nominees from both corporate positions beyond the executive suite and nontraditional environments.

103.   With respect to the nominating process to select individuals to serve on the Company's Board, and the desired characteristics of the Board, the 2020 Proxy stated:

**Process for Selection and Nomination of Directors**

In connection with the process of selecting and nominating candidates for election to the Board, the Nominating and Corporate Governance Committee reviews the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the Board. Among the qualifications to be considered in the selection of candidates, the Nominating and Corporate Governance Committee considers the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as

SHAREHOLDER DERIVATIVE COMPLAINT

well as such candidate's past or anticipated contributions to the Board and its committees so that *the Board includes members, where appropriate, with diverse backgrounds*, knowledge and skills relevant to the business of the Company. *The charter for the Nominating and Corporate Governance Committee specifically states that diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership*.[17]

104.   In reality, Monster has made no real efforts to promote diversity on its Board and among its senior executives.  Indeed, in the 2019 and 2020 Proxy the word "diversity" only appears two (2) times.  The Board and Compensation Committee has also breached its duty of candor and acted in bad faith by continuing to reward the Company's executives with increased salaries, bonuses, and long-term equity compensation notwithstanding the executives' failure to ensure the Company's compliance with the law in the areas of sexual harassment and discrimination, and failure to promote and achieve diversity at the Company and on the Board itself.

105.   As alleged herein, the Board and Compensation Committee have done so by filing Proxy Statements that conceal the fact that the Company's executive compensation program places no weight on compliance with the law, maintenance of effective internal controls, and success (or lack thereof) in enforcing the Company's supposed "zero tolerance" policy regarding sexual harassment and discrimination.

---

[17] *See* Monster 2020 Proxy Statement at pp. 51-52.

SHAREHOLDER DERIVATIVE COMPLAINT

**C.     At All Relevant Times, the Individual Defendants Have Had Actual Knowledge That, Contrary to Its Public Statements, Monster Was Not Achieving Success with Respect to Diversity, Inclusion, and the Company's Supposed Zero Tolerance Policy Regarding Sexual Harassment and Discrimination**

106.    Monster, led by its Board, has consistently refused to appoint Black and minority individuals to the Board and to management positions within the Company.  The Company was called out all the way back in 2009 for its refusal to do so, but has persisted in its intransigence.   Beginning in 2009, some of the Company's major shareholders, including CALSTRS, the State of New York, the Connecticut Retirement Plans, and the City of Philadelphia Public Employees Retirement System began calling on Monster to diversify its Board.

107.    In 2009, CALSTRS and Calvert Investments, a mutual fund company, withdrew a shareholder proposal at Monster Beverage aimed at increasing Board diversity. Monster had agreed to add diversity to the list of factors to be considered by the group of directors nominating new Board candidates.[18]   While Monster did make that change, its Board is no more diverse now in terms of racial and ethnic diversity than it was eleven years ago.

108.    In 2009, CALSTRS approached Monster about increasing the diversity of its Board. After the Company agreed to add a formal diversity policy to its nominating committee charter, CALSTRS withdrew a proposal that it was hoping to put to a shareholder vote. But Monster never increased

---

[18] *See* Gretchen Morgenson, "Not Walking the Walk on Board Diversity," THE NEW YORK TIMES, May 31, 2014, available at https://www.nytimes.com/2014/06/01/business/not-walking-the-walk-on-board-diversity.html, last visited Aug. 24, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

diversity on its Board, reflecting bad faith by the Board, which at the time included Defendants Sacks, Polk, Schlosberg, Selati, and Vidergauz.[19] When the New York Times ran an article three years later about Monsters' failure to change its Nominating & Corporate Governance Committee charter, Roger Pondel, a Monster spokesman, declined to say why the company did not use the opportunity for a new board appointment to increase diversity among its directors.[20]

109.  On January 8, 2015, the Comptroller of the City of New York, Mr. DiNapoli, issued the following press release:

> New York State Comptroller Thomas P. DiNapoli today announced that the New York State Common Retirement Fund (Fund) has filed a shareholder proposal with Monster Beverage Corporation calling on the company to report on plans to increase gender and racial diversity on its board. The Fund's proposal is co-sponsored by the Connecticut Retirement Plans and Trust Funds, The City of Philadelphia Public Employees Retirement System and Calvert Investments. The filers hold combined shares of Monster Beverage with an approximate value of $57 million.
>
> "It's unsettling that Monster Beverage has ignored repeated, widespread investor support for increased board diversity,"

---

[19]  *See* Gretchen Morgenson, "Not Walking the Walk on Board Diversity," THE NEW YORK TIMES, May 31, 2014, available at https://www.nytimes.com/2014/06/01/business/not-walking-the-walk-on-board-diversity.html, last visited Aug. 24, 2020.

[20]  *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

DiNapoli said. "Company value and board diversity are linked. Businesses that rely on consumers should be particularly mindful that their boards should reflect the men and women who purchase their products. When a board fails to be responsive to its shareholders, it is often symptomatic of larger, systemic problems in the company's governance."

*"For almost six years, Monster Beverage has failed to live up to its promise of diversifying its Board of Directors," Connecticut State Treasurer Denise L. Nappier said. "In 2009, in response to investor pressure, it said diversity would be a factor in considering board nominees. It defies belief that the company's directors have not identified one diverse candidate to serve on the board since then. It is past time for Monster Beverage to follow through on its commitment."*[21]

110. In 2014, the New York State Retirement Fund submitted a shareholder proposal for Monsters' annual shareholder meeting which called for efforts to increase Board diversity at Monster.  The proposal stated, among other things, that:

> "We believe that diversity, inclusive of gender and race, is an essential measure of sound governance and a critical attribute to a well-functioning board.  A growing body of academic research

---

[21]Available                                                                                    at https://www.osc.state.ny.us/press/releases/2015/01/dinapoli-monster-beverage-needs-diversify-board?redirect=legacy, last visited Aug. 23, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

shows that there is a significant positive relationship between firm value and the percentage of women and minorities on boards. Boardrooms need to respond to the strong demographic shifts we are seeing in the United States.

BE IT RESOLVED

That the Board of Directors consistent with their fiduciary duties:

1.      Take every reasonable step to ensure that a wide range of women and minority candidates are in the pool from which Board nominees are chosen;

2.      Publicly commit itself to a policy of board inclusiveness to ensure that:

·   A wide range of women and minority candidates is routinely sought as part of every Board search the company undertakes;

·   The Board strives to obtain diverse candidates by expanding director searches to include nominees from both corporate positions beyond the executive suite and non-traditional environments, including government, academia, and non-profit organizations; and

·   Board composition is reviewed periodically to ensure that the Board reflects the knowledge, experience, skills, and diversity required for the Board to fulfill its duties.

3.      To report to shareholders, at reasonable expense and

SHAREHOLDER DERIVATIVE COMPLAINT

omitting proprietary information, its efforts to encourage diversified representation on the Board.

As both employees and consumers, women and minorities increasingly account for a larger portion of profits and revenues for many companies;

Therefore, we believe it is critical for Monster Beverage Corporation to have a board of directors that reflects the diversity that exists within its target markets"

111. The Individual Defendants caused Monster to oppose this shareholder proposal, and to cause the Company to include the following statement in the 2014 Proxy:

**The Company's Statement in Opposition**

*The Board* has carefully considered the Board Diversity Proposal and, for the reasons described below, *believes that adopting the Board Diversity Proposal is not in the best interest of the Company or its stockholders*.

The Board believes that the Company's existing nominating process is designed to identify the best possible nominees for director, regardless of the nominee's gender, racial background, religion or ethnicity. The Board acknowledges the benefits of achieving broad diversity throughout the Company, but believes the Board Diversity Proposal could impede its ability to select the most suitable and qualified candidates for membership on the Board and would impose unnecessary administrative burdens and costs.

*The Company's employment policies and practices*, including recruitment, promotion and compensation, *are guided* by the

50

SHAREHOLDER DERIVATIVE COMPLAINT

fundamental principle that decisions are made on the basis of whether the individual's capabilities and qualifications fit the Company's needs and meet the requirements of the position, *without regard to gender, race, religion, ethnicity or other classification*. The Company also applies these policies and practices to its selection of directors.

When identifying and evaluating candidates for director, diversity is a part of the overall mix of factors that the Board and the Nominating Committee consider. The Nominating Committee seeks individuals who are qualified to be directors based on the candidate's experience, skills and knowledge of business and management practices. The Board and the Nominating Committee consider diversity broadly to include viewpoint, professional experience, individual characteristics, qualities and skills resulting in the inclusion of naturally varying perspectives among the directors. In addition, the Nominating Committee Charter specifically includes diversity among the factors to be considered when evaluating candidates. The Board and the Nominating Committee also consider whether these capabilities and characteristics will enhance and complement the full Board so that, as a unit, the Board possesses the appropriate skills and experience to oversee the Company's business and serve the long-term interests of our stockholders. Finally, the Board and Nominating Committee believe that no single criterion, category or trait, such as gender or minority status, is determinative in obtaining diversity on the Board.

SHAREHOLDER DERIVATIVE COMPLAINT

The Company's approach is consistent with amendments the SEC adopted to its rules governing proxy statement disclosure. The amendments, which were adopted in December 2009, require companies to disclose whether, and if so how, their nominating committees consider diversity in identifying nominees for director. In its adopting release, the SEC explicitly acknowledged that companies may define diversity in different ways. The SEC states:

"We recognize that companies may define diversity in various ways, reflecting different perspectives. For instance, some companies may conceptualize diversity expansively to include differences of viewpoint, professional experience, education, skill and other individual qualities and attributes that contribute to board heterogeneity, while others may focus on diversity concepts such as race, gender and national origin. We believe that for purposes of this disclosure requirement, companies should be allowed to define diversity in ways that they consider appropriate. As a result, we have not defined diversity in the amendments."

The Board and the Nominating Committee seek qualified candidates for director, and consider diversity as a factor, but believe that *the Board Diversity Proposal is unnecessarily restrictive and would not maintain the necessary flexibility in the nominating process to ensure that the most qualified candidates are selected as directors*. In addition, the reporting

SHAREHOLDER DERIVATIVE COMPLAINT

obligations contemplated by the Board Diversity Proposal would be expensive and time consuming, without any corresponding benefit to our stockholders. The Board believes that the Company's existing nominating process, including the factors considered by the Nominating Committee in evaluating director candidates, is the best approach. The imposition on the nominating process of gender and minority requirements and affirmative search obligations would undermine the Company's holistic evaluation of candidates, unduly restrict the Nominating Committee in the performance of its duties and add administrative burdens and costs, without necessarily resulting in the selection of the best director candidates for the Company.

For the reasons stated above, the Board believes that instituting the change called for by the Board Diversity Proposal is unnecessary and not in the best interests of our stockholders.

**THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "AGAINST" THE ADOPTION OF THE BOARD DIVERSITY PROPOSAL**.

112. Thus, from at least 2009 to the present, the Individual Defendants have actively opposed proposals from major shareholders of the Company to nominate racial and ethnic minorities to the Board, as well as women.  And they have done so with statements to the effect that Monster Beverage does not consider diversity of race and ethnicity to be important factors, or at least more important factors than other factors, when choosing Board candidates, and that increasing diversity on the Board

53

SHAREHOLDER DERIVATIVE COMPLAINT

was "unnecessarily restrictive" and would prevent the Company from ensuring that "the most qualified candidates are selected as directors." These comments obviously reflected a racist attitude by the Individual Defendants since the implied premise of the statements was that choosing women and minorities as Board members would necessarily mean passing over more qualified white candidates.

113.  To this day, there are no racial or ethnic minorities on the Company's Board and the Defendants' discriminatory and exclusionary attitudes persist.

114.  The lack of diversity at the top at Monster has resulted in economic discrimination.  The pay of the Company's CEO in fiscal year 2020 was 253 times as high as the median pay of all other employees:

**CEO Pay Ratio:**

Pursuant to Item 402(u) of Regulation S-K and Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Company is required to provide the ratio of the annual total compensation of Mr. Sacks, who has served as the Company's Chief Executive Officer since November 1990, to the annual total compensation of the median employee of the Company.

As reported in the Summary Compensation Table, **Mr. Sacks' annual total compensation for 2019 was $13,982,434**. In accordance with Item 402(u), we are using the same "median employee" identified in our 2019 and 2018 pay ratio calculations, as we believe that there has been no change in our employee population or employee compensation arrangements that we believe would result in a significant change to our pay

SHAREHOLDER DERIVATIVE COMPLAINT

ratio disclosure. See our 2019 and 2018 proxy statements for information regarding the process we utilized to identify our "median employee." We then identified and calculated the elements of this employee's total compensation for 2019 in accordance with the requirements of Item 402(c)(2)(x) of Regulation S-K, resulting in *a median annual total compensation of all employees of the Company and its subsidiaries (other than the Chief Executive Officer) of $55,169. Based on this information, for 2019, the ratio of the compensation of the Chief Executive Officer to the median annual total compensation of all other employees (other than the Chief Executive Officer) was estimated to be 253:1*.[22]

115. The racial pay gap is well-documented and persistent. According to data from the Economic Policy Institute, Black workers "have been losing ground since 2000, with larger [B]lack-white wage gaps across the entire distribution of earnings."[23] For example, Black wages at the median in 2019 were only 75.6 percent of white wages, a 3.6 percent increase from 2000, when Black wages at the median were 79.2 percent of white wages.[24] Even when looking at wages by education level, Blacks are paid less than whites. Blacks with advanced degrees are paid 82.4 cents for each dollar earned by whites with an advanced degree.

---

[22] *See* Monster 2020 Proxy Statement at p. 47.

[23] *See* Elise Gould, "*State of Working America Wages 2019*," ECONOMIC POLICY INSTITUTE, Feb. 20, 2020, available at https://www.epi.org/publication/swa-wages-2019/, last visited August 4, 2020.

[24] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT



**On average, white workers are paid more than black and Hispanic workers at nearly every education level**

Average hourly wages, by race/ethnicity and education, 2019

**Source:** Author's analysis of EPI Current Population Survey Extracts, Version 1.0 (2020), https://microdata.epi.org

**Economic Policy Institute**

116.   The practice of asking job applicants for their salary history has also perpetuated lower compensation for Blacks and minorities.

SHAREHOLDER DERIVATIVE COMPLAINT

117.   In 2016, Massachusetts enacted the first ban, preventing employers from asking job candidates about their salary history. Since then 18 other states, as well as many cities, have implemented salary history bans.[25] The goal of these bans is to prevent initial wage disparities from multiplying as individuals move from one job to another. "Employers should be hiring and paying potential employees for the experience and qualifications they have," said New Jersey Senator Loretta Weinberg in discussing the law that New Jersey enacted. "Knowing how much they were paid in the past is irrelevant and often times leads to a cycle of pay inequity. By eliminating inquiries of salary history, we can help curb wage discrimination based not only on gender, but also race, age and other characteristics," Weinberg added.

118.   While each state's bill is slightly different in terms of the scope of employers covered and the explicit intent, the overall goal is to prevent employers from anchoring salary offers on previous salaries and unintentionally perpetuating the wage gap.

119.   In a recently released working paper, researchers at Boston University found that, following the implementation of salary history bans (SHB), pay for job switchers increased by 5 percent more than for comparable job changers.[26] Moreover, they found even larger benefits for Black and female job switchers, who saw pay increases of 13 percent and 8 percent, respectively. "Salary histories appear to account for much of the

[25] *See* Shahar Ziv, "*Salary History Bans Reduce Racial and Gender Wage Gaps; Every CEO Should Use Them,*" FORBES, June 23, 2020.

[26] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

persistence of residual wage gaps," the authors note. "For women and African-Americans, the pay increases following an SHB represent a sizeable portion of the residual wage gap measured for job-changing employees, suggesting that most of this gap is not related to productivity differences between workers.[27]

120.   The study's authors note that wage gaps may not be caused by individual and overt discrimination, but that "salary histories enable a form of institutional discrimination. Even if employers do not individually discriminate, the use of salary histories appears to perpetuate the effects of past discrimination or other group inequities."[28]

121. With respect to the false statements in Monster's Proxy Statement about diversity in the Board nomination process, Defendants had actual knowledge of the specific requirements regarding diversity that were required by law to be included in the Company's Proxy Statements because, after the 2008-2009 stock market crash, the SEC passed a major set of rules mandating additional proxy disclosures regarding the board nomination process.

///

///

///

///

///

---

[27] *Id.*
[28] *Id.*

58

**D.    Facts Demonstrate the Board Had Knowledge That, Far From Enforcing the Company's Supposed "Zero Tolerance" Policy Regarding Sexual Harassment and Discrimination, the Company Fostered and Condoned a Testosterone-Charged Culture Which Protected Male Executives Who Engaged in Rampant Sexual Harassment, While at the Same Time Retaliating Against Female Workers Who Reported Harassment**

122.    In reality, contrary to the statements in the Company's Proxy Statements and Code of Business and Ethics that diversity is a "tremendous asset," Monster Beverage is a company run by white males who discriminate and demean women and minorities.

123.    Monster is best known for aggressively marketing energy drinks to boys and men. "Unleash the Beast" is one slogan. Its hyper-caffeinated drinks have names like Assault and Maxx. The Company's scantily clad "Monster Girls" are used to market the Company's products.



SHAREHOLDER DERIVATIVE COMPLAINT

124.   In 2018, five former female employees of Monster Beverage sued the company over its discriminatory, abusive culture.  One of the women was Sara Rabuse, who worked as a make-up artist at Monster.  She sued Monster Beverage and one of its executives, Brent Hamilton, who choked her, bit her thumb, and pulled her hair so violently that clumps of her hair came out.  The two were in Tennessee in 2016 for work on behalf of Monster at the Country Music Awards.   As an article describing Hamilton's disgusting and demeaning conduct noted: "Rabuse had red marks around her neck from Hamilton trying to strangle her, according to the police report. Her thumb was bloody from where Hamilton bit her. Her nails were broken from fighting him off."[29]   Hamilton was arrested, and Rabuse was hospitalized after a hotel guest found her crumpled on the floor of their room.

125.   Amazingly, for over three years, including even as he awaited a criminal trial for strangling Ms. Rabuse during the business trip in 2016, Brent Hamilton was still allowed to keep his job as the Head of Music Marketing at Monster Energy.   And after he strangled and bit Rabuse, Hamilton continued to sexually harass women at Monster Beverage.  It was only after he was caught sending sexually explicit texts to a co-worker that Hamilton was finally let go in 2019.

/ / /

/ / /

---

[29] *See* Emily Peck, "5 Women Sue Monster Energy Over Abusive, Discriminatory Culture," HUFFINGTON POST, Jan. 23, 2018.

SHAREHOLDER DERIVATIVE COMPLAINT



DAVIDSON COUNTY COURT -- **Brent Hamilton on the night he was arrested in 2016**

126.   Monster stood by Hamilton, even after his arrest.  Hamilton was allowed to keep his job while Rabuse lost hers.  "My impression was they weren't taking things seriously. Or my allegations seriously,' said Rabuse.[30]

127.   According to the women who have sued Monster Beverage, Brent Hamilton's conduct was by no means an exception.

128.   John Kenneally was also allowed to remain a Vice President at Monster despite three women accusing him of bullying, harassment and

---

[30] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

retaliation. The women alleged that Kenneally actively undermined their reputations and forced them out of the Company. The Huffington Post obtained text messages he sent to one of these women (Paige Zeringue), in which he described her as a "whore," made a racially charged comment about "black dicks," and used the term "bitch" to refer to both her and another female employee.[31]  Zeringue told ABC News that she was initially in a consensual sexual relationship with her former boss at the Company, John Kenneally.

129.   "I realized very soon that it was absolutely the worst mistake of my life," Zeringue said.[32]  She added that she told him she wanted out of the relationship, and angry texts and verbal abuse soon followed. "He would call me names, and things that no one in my life would ever call me," she said. "He would call me a whore."

130.   Another former employee, Fran Pulizzi, told ABC News that she had heard Kenneally call *another* female employee a "whore."[33]  "And it wasn't uncommon for him to discuss sexual relations among employees," Pulizzi added.

131. Pulizzi also alleged that she faced unlawful retaliation by Monster executives after she participated in an internal investigation at Monster where she was promised that her comments would be treated

---

[31] *See* Emily Peck, "5 Women Sue Monster Energy Over Abusive, Discriminatory Culture," HUFFINGTON POST, Jan. 23, 2018.

[32] *See* Catherine Thorbecke, "Women Suing Monster Energy Share Stories of Alleged Discrimination, Harassment," ABC NEWS, Feb. 4, 2018, available at https://abcnews.go.com/GMA/News/women-suing-monster-energy-share-stories-alleged-discrimination/story?id=52746025, last visited Aug. 24, 2020.

[33] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

confidentially.  Pulizzi alleged in a lawsuit she filed against Monster that after she had been working at the Company for five years, she was subjected to hostile and harassing behavior from Kenneally when she participated in an investigation by HR into another employee's sexual harassment complaint.  "I thought for sure they were going to keep my statements confidential," Pulizzi said. "When I found out within a few days that John had been made aware of everything I said, I was in shock."

132.  Pulizzi alleges that Kenneally then began to bully and harass her at work before ultimately freezing her out.  "He refused to talk to me, and our open communication was a key part of my job," she said. "He refused to work with me, refused to acknowledge me."[34]

133.  Another former employee, Jamie Hogan, argued in court documents filed in August 2017 that her former supervisor at Monster Energy would "publicly insult and berate her for having children." "He would make comments about, 'Oh, we'd have to move our meeting so that Jamie could go home at night and see her kids,'" Hogan told ABC News.[35] She added that he would also schedule "impromptu meetings." "I didn't show up because I wasn't aware of it," she said. "It just became increasingly difficult to do my job."

134.  Hogan said she felt retaliated against after she reported her concerns to the human resources department, and eventually left the Company.

135.  Moreover, in 2018, a sixth female employee at Monster (Karen

---

[34] *Id.*
[35] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

Simmons) came forward with allegations of sexual harassment, discrimination, and retaliation.  Ms. Simmons, a 50-year-old former sales representative based in Alabama, spent nearly two years with Monster. She amassed a strong track record, even as she fended off one of her Atlanta-based managers, Ted Cook, who hit on her, made comments about her breasts, tried to get her drunk and invited her more than once for an "evening nightcap" in his hotel room on work trips.  According to Simmons, given the Company's cultural penchant for partying, drinking alcohol at Company events was a given.  She didn't drink, and repeatedly rebuffed Cook's efforts to "get her drunk," she said. She declined his invitations for a "nightcap" in his hotel room. [36]

136.  "The more Ted drank, the more handsy he got," Simmons told HuffPost. On one occasion when he asked for a hug, Simmons said she uncomfortably gave him a half-hug. He wasn't satisfied, and pulled her in for a do-over, she said. "He said, 'I felt that," Simmons said, meaning he could feel the pressure of her breasts on his chest.

137.  Once Ms. Simmons reported the harassment, she was retaliated against and fired, in violation of the Company's alleged "zero tolerance" policy.  "I knew saying things gets you retaliation," Simmons later stated.[37]

138.  At a dinner in New Orleans that Simmons attended with Cook, Duck and several other male Monster employees, she heard them joking

---

[36] *See* Emily Peck, "Trapped Inside the Monster Energy Frat House," HUFFINGTON POST, Mar. 29, 2018.

[37] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

about "having to go to HR classes," if they misbehaved.  "It was just like a big joke," Simmons said.

139.  Simmons' last few months at Monster played out like a corporate gaslighting. In February 2017, less than two months after she had received a decent performance review from Duck, he asked to meet up with her in Florida where they had both traveled for business. [38]

140.   What happened next came as a total shock.  Duck showed her a disciplinary write-up.  The write-up claimed she was unwilling to leave her hometown for work. Yet, she was in Florida on a business trip at the time she was given the write-up. "I was out of town every week," she said. The writeup also claims that Duck spoke with Simmons in January about these issues. Simmons said the only feedback she got that month came when she downloaded her performance review from the Company's internal website. Monster provided HuffPost with a copy of the document.

141.   Dated Dec. 31, 2016, the review judges Simmons' performance as "Meets Standards," giving her a 2.14 rating out of 4, and was generally upbeat and positive but is peppered with constructive criticism.  "At this point the only thing I can ask Karen to improve on is slowing down," Duck wrote. "She also needs a little more work on time management."  He called her a "great problem solver," who sometimes needs help prioritizing, "I have asked her to make sure when she schedules a meeting...to ALWAYS make sure she can do it…"

142.  In the category of "job knowledge and skill," Duck gave Simmons a rating of 3 or "exceeds expectations."  As a result, the negative

---

[38] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

write-up baffled Simmons.  She cried.  "Where is this coming from?" she asked him. She wanted to understand what she did wrong, so she could fix things. Duck refused to provide more details. "He said I was making things worse and to go home and forget about it," Simmons said.[39]

143.   For about a month-and-a-half after that, Duck, still Simmons' direct supervisor, did not talk to Simmons. She said he wouldn't respond to texts or calls. One thing he apparently did do: update Simmons' Dec. 31 performance review — topping the document off with an extremely harsh "summary paragraph" slamming her for poor performance.  The added paragraph is dated March 3, 2017. The tone of this text is vastly different from the rest of the document. "At this point, Karen has lost the trust of some of her bottlers and needs to 'fix' this soon or she will struggle," Duck wrote. "Karen acts disconnected in meetings and face to face with her Coke partners."  Duck used gender-coded words like "abrasive" and "demanding" to describe her demeanor with outside contacts at Coca-Cola bottlers Simmons worked with.

144.   Simmons, meanwhile, took her dismissal very hard. She was so embarrassed about being fired that she stopped leaving her home during the day, not wanting anyone in her small Alabama hometown to ask her why she wasn't working. "The first six months were awful," she said. "If I needed to go out, I'd go at three or four in the morning or ten or 11 at night."[40]

145.   Because she lost her job, Simmons' husband, a 68-year-old who

_____

[39] *Id.*
[40] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

supervises utility crews in Tampa, has had to put off his retirement. He had relocated to Tampa temporarily to make a little extra cash before finishing his career. Now it's unclear when he can come home.

146.   "This has affected my marriage, my life. It's been really tough on my family," she said, breaking down in tears. Simmons is responsible for paying college tuition for her 21-year-old daughter.

147.   The Board was fully aware of all these allegations and failed to take action to protect the female employees.   Even worse, demonstrating their bad faith, the Director Defendants financially rewarded the male executives who engaged in the wrongdoing and knowingly condoned the Company's wrongful retaliation against the women who had reported the harassment.

148.   The Board cannot disavow knowledge of the wrongful harassment and retaliation because the wrongful conduct was publicly reported, beginning in at least 2018.   Moreover, when Ms. Simmons' allegations were publicly reported in 2018, Monster hired a third party to "investigate" the allegations and required the investigator to report directly to the Board:

> "Monster announced it was hiring a third party to review its human resource policies and procedures. The investigators will report straight to the company's board of directors."

See Emily Peck, "Trapped Inside the Monster Energy Frat House," HUFFINGTON POST, Mar. 29, 2018.

149.   Egregiously, Defendants Sacks and Schlosberg, the two most senior executives at the Company, absolved the Company's executives of wrongdoing before the third-party investigator had even begun its work:

SHAREHOLDER DERIVATIVE COMPLAINT

"We are confident that the recent portrayal of the company in the media is not representative of [our] culture and practices," Monster chairman and CEO Rodney Sacks and vice chair and president Hilton Schlosberg said in a statement. But they added that "in the context of the allegations made by the women bringing these lawsuits, we believe it is prudent."

*See* Emily Peck, "Trapped Inside the Monster Energy Frat House," HUFFINGTON POST, Mar. 29, 2018.

150.   In other words, Sacks and Schlosberg, far from keeping an open mind about the investigation that the Board had ordered, stated they were sure the allegations were false and that the Company would be vindicated, but that a kangaroo court would nonetheless be convened.  A clearer case of a pre-ordained result for the investigation could not be imagined.  Before the work of the investigator had even begun, the Director Defendants themselves directed Company spokesmen to make statements denigrating the women and calling them "disgruntled former employees." They also allowed Ms. Simmons' direct boss to make a public statement to the effect that Ms. Simmons had never complained to him about the wrongful conduct, thus attempting to undermine Ms. Simmons' allegations from the outset.  As reported by the Huffington Post at the time:

● ***Robert Duck, Simmons' direct boss*** who works out of Monster's office in Florida, also witnessed Cook's behavior, but ***told her to brush it off***, she said. "***He said Ted was harmless, 'a dirty old man***,'" Simmons recalled.

● ***Through a company spokesman, Duck said Simmons never complained***. When reached by phone by HuffPost, he hung up. He did not respond to follow-up texts. Cook also did not

SHAREHOLDER DERIVATIVE COMPLAINT

respond to a call, text or LinkedIn message.

● In public statements at the time, *the company painted the women as disgruntled employees and said that the suits [by the other five former female employees] were unrelated*.

● Simmons' former boss Duck, who she said witnessed Cook's behavior, is still working at Monster.

151.   The Director Defendants not only knew that such conduct was in flagrant violation of the Company's alleged "zero tolerance" policy, they directly participated in the wrongful conduct and retaliation by allowing the women who were harmed to be fired and then publicly denigrated them before the work of the supposedly independent third party (who reported directly to the Board) had even begun.

152.   The Director Defendants have known at all relevant times that Monster Energy markets its drinks primarily to men using cliched tropes about masculinity. Scantily clad Monster Girls in leather bikini tops serve as brand ambassadors. One beverage is actually called "Assault." The company has given out Monster branded condoms as a promotional gimmick.

153.   That toxic male culture translates into policy where sexual harassment is not taken seriously. The Director Defendants are well aware that Monster's employee guidelines require that managers who observe sexual misconduct must report it. But in Ms. Simmons' case, her direct boss, Duck, admitted that he observed the harassment of Simmons, but he never informed Monster's HR department about Cook's conduct.  Duck was never reprimanded for his violation of Company policy; instead, Simmons was retaliated against for reporting the conduct, in compliance with Company policy.

SHAREHOLDER DERIVATIVE COMPLAINT

154.   According to the Huffington Post, as of 2018 only 13 percent of the Company's 505-person U.S. sales team are women. If you include administrative assistants, the percentage rises to 18 percent female, according to an internal employee directory from January obtained by HuffPost. None of the Company's 11 vice-presidents in sales are women.

155.   Monster said some of the numbers HuffPost obtained were incorrect, but declined to offer specifics or provide its own data.[41]

156.   Sales is such a male-dominated department at Monster that at a 2016 national sales meeting in Las Vegas — even with human resources representatives in attendance — a vice-president told a blatantly misogynistic joke to a packed room, according to three separate accounts from current and former employees.   The joke that the male Monster executive told was as follows: There is an old bull and a young bull on a hill, overlooking a field of cows. Young bull says to the old bull: "Let's run down there and fuck a cow." Old bull says, nah: "Let's walk down there and fuck them all."[42]

157.   The joke was allegedly told to inspire the sales personnel.

**E.   Background of Additional Disclosures Mandated by the SEC in Proxy Statements Relating to the Process by Which Individuals Are Nominated to the Boards of Directors of Publicly-Traded Companies**

158.   In 2008-2009, the stock market plunged by over 50% due to mortgage-related fraud.   The Dow Jones Industrial Average ("DJIA") hit a

---

[41] *See* Emily Peck, "Trapped Inside the Monster Energy Frat House," HUFFINGTON POST, Mar. 29, 2018.

[42] *Id*.

SHAREHOLDER DERIVATIVE COMPLAINT

market low of 6,469.95 on March 6, 2009, having lost over 54% of its value since the October 9, 2007 high.   In the ensuring years, the United States suffered a massive recession.   Many corporations such as Countrywide, Lehman Brothers, Merrill Lynch, Fannie Mae, Freddie Mac, and American International Group collapsed or had to be rescued by the government due to fraud or exposure to the subprime mortgage market.   But for a massive governmental intervention to save companies and inject unprecedented liquidity into the market, many commentators at the time believe another great depression would have ensued.

159.   But before the 2008-2009 stock market crash, another major stock market crash had occurred in 2001-2002.   Between 1995 and its peak in March 2000, the Nasdaq Composite stock market index rose 400%, only to fall 78% from its peak by October 2002, giving up all its gains during the bubble. During the "dot.com" crash, many online shopping companies, such as Pets.com, Webvan, and Boo.com, as well as several communication companies, such as Worldcom, NorthPoint Communications, and Global Crossing, failed and shut down.   Some companies, such as Cisco, whose stock declined by 86%, and Qualcomm, lost a large portion of their market capitalization but survived.   The "Internet bubble" that preceded the crash was fueled by speculation on new Internet companies and by widespread but temporary abandonment by Wall Street and analysts of "traditional" and allegedly "outdated" analytic tools such as price earnings ratios, which supposedly were irrelevant to the new-fangled dot.com companies, (which of course had no profits, such that ignoring price earnings ratios proved convenient for the analysts touting the companies and the investment banks seeking to profit from bringing the companies public).   At the time, there was also a widespread lack of any type of "Chinese wall" between the

SHAREHOLDER DERIVATIVE COMPLAINT

underwriting and analyst departments at major Wall Street firms. Securities analysts at brokerage firms were frequently influenced by their partners at the firm who were making much more money from the underwriting business and who thus did not want to "alienate" their clients by having their colleagues write negative analyst reports.

160.   When the dot.com bubble burst, it had a major negative effect on the economy and the value of Americans' pension funds, retirement accounts, and investment savings.   In light of these devastating effects, Congress and the SEC passed major legislation to try to provide additional protection to investors.

161.   The Sarbanes–Oxley Act of 2002 (Pub.L. 107–204, 116 Stat. 745, enacted July 30, 2002), also known as the "Public Company Accounting Reform and Investor Protection Act" (in the Senate) and "Corporate and Auditing Accountability, Responsibility, and Transparency Act" (in the House) and more commonly called Sarbanes–Oxley or SOX, established new or expanded requirements for all U.S. public company boards, management and public accounting firms. A number of provisions of the Act also apply to privately held companies, such as the willful destruction of evidence to impede a federal investigation.   The bill was enacted to protect investors in light of massive fraud at a number of companies, including Enron and WorldCom.

162.   Due to Congressional recognition that a company's Board of Directors and senior management should bear ultimate responsibility for wrongdoing, the Sarbanes-Oxley Act added responsibilities to a public corporation's board of directors, added criminal penalties for certain misconduct, and required the SEC to create regulations to define how public corporations are to comply with the law.   In addition, it added a

SHAREHOLDER DERIVATIVE COMPLAINT

requirement that a company's CEO and CFO certify a company's financial results in Form 10-Ks and 10-Qs.

163. In 2003, the SEC passed a final rule aimed at providing shareholders with additional disclosures in companies' proxy statements regarding the persons nominated to serve on Boards of Directors and the process by which they are nominated. The final rule was entitled "Disclosure Regarding Nominating Committee Functions and Communications Between Security Holders and Boards of Directors." *See* 17 CFR Parts 228, 229, 240, 249, 270 and 274 [Release Nos. 33-8340; 34-48825; IC-26262; File No. S7-14-03].

164. In explaining the need for the rule, the SEC stated:

The amendments are designed to address the growing concern among security holders over the accountability of corporate directors and the lack of sufficient security holder input into decisions made by the boards of directors of the companies in which they invest. Currently, companies must state whether they have a nominating committee and, if so, must identify the members of the nominating committee, state the number of committee meetings held, and briefly describe the functions performed by such committees. In addition, if a company has a nominating or similar committee, it must state whether the committee considers nominees recommended by security holders and, if so, must describe how security holders may submit recommended nominees. The amendments are designed to build upon existing disclosure requirements to elicit a more detailed discussion of the policies and procedures of nominating committees as well as the means by which security holders can

SHAREHOLDER DERIVATIVE COMPLAINT

communicate with boards of directors.

165.   Six years later, and after the 2008-2009 stock market crash, the SEC passed another set of rules mandating additional proxy disclosures regarding the board nomination process.   At an open meeting held on December 16, 2009, the SEC approved a set of proposed rules to enhance the information provided to shareholders in company proxy statements regarding a number of risk oversight, compensation, board leadership and composition and other corporate governance matters.  The SEC released the text of the final rules on the same date they were adopted.

166.   The final rules were proposed in July 2009.  However, based on the more than 130 comment letters that the SEC received on the proposals, the final rules reflect a number of changes that result in clearer and more precisely defined, but in some cases broader, disclosure standards than what the SEC had initially proposed.  Among the more significant changes from the rule proposals are the following:

> **Director qualifications**.   The final rules require disclosure concerning the specific experience, qualifications, attributes or skills of directors and director nominees that led to the conclusion that the person should serve as a director.   The proposed rules would have required this disclosure to, in addition, address how these factors related to directors' service on board committees.
>
> **Compensation Practices and Risk Management**.  The proposed rules would have required disclosure in the Compensation Discussion and Analysis of any compensation policies and compensation practices applicable to employees (whether or not they are executive officers) if they created risks that "may have a

SHAREHOLDER DERIVATIVE COMPLAINT

material effect" on the company.   The final rule requires disclosure of employee compensation policies and practices that create risks only if they "are reasonably likely to have a material adverse effect on the company."   Further, pursuant to the final rule, this disclosure will not be part of the Compensation Discussion and Analysis, but instead will be a new and separate disclosure requirement.

**Diversity Considerations in the Director Nomination Process**. In the rule proposals, the SEC asked whether it should amend its rules to require disclosure of additional factors that a nominating committee considers when selecting someone for a position on the board, such as diversity, and whether it should amend the rules to require additional or different disclosure related to board diversity.   *The rules as adopted require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for directors. Moreover, in what may be a regulatory first for disclosure of the inner workings of a board, if a nominating committee has a policy with regard to consideration of diversity, the rules require disclosure of how the policy is implemented, as well as how the nominating committee assesses the effectiveness of the policy.*[43]

---

[43] *See "SEC Adopts Final Rules on Enhanced Proxy Statement Disclosures,"* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE, Dec. 21, 2009, available at https://corpgov.law.harvard.edu/2009/12/21/sec-adopts-final-rules-on-enhanced-proxy-statement-disclosures/, last visited July 24, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

167.   As this brief history demonstrates, in the wake of the two major stock market crashes of this century, Congress and the SEC passed important laws requiring significant additional responsibilities and disclosures by corporate boards.

168.   These additional Board-level responsibilities and potential criminal liability were needed because of the devastating effect corporate fraud has on the livelihood and retirement savings of Americans.

169.   The additional disclosures required in proxy statements regarding the qualifications and nominating process of persons nominated to serve on Boards of Directors were necessary because, as the ultimate decision-making body of a company, the Board bears ultimate responsibility for corporate decisions.   Congress and the SEC rightfully determined that shareholders needed additional information about the qualifications of director nominees and the process by which a company's nominating and corporate governance committee identifies and selects persons to serve on corporate boards.

170.   And beginning in 2009, additional specific disclosures were mandated requiring "disclosure of additional factors that a nominating committee considers when selecting someone for a position on the board, such as diversity, and whether it should amend the rules to require additional or different disclosure related to board diversity.  *The rules as adopted require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for directors."*

171.   In passing the 2009 rule, the SEC stated:

In the Proposing Release, we also requested comment on whether we should amend our rules to require disclosure of additional factors considered by a nominating committee when

SHAREHOLDER DERIVATIVE COMPLAINT

selecting someone for a board position, such as board diversity. A significant number of commenters responded that disclosure about board diversity was important information to investors.[44] Many of these commenters believed that requiring this disclosure would provide investors with information on corporate culture and governance practices that would enable investors to make more informed voting and investment decisions.[45] Commenters also noted that there appears to be a meaningful relationship between diverse boards and improved corporate financial performance, and that diverse boards can help companies more effectively recruit talent and retain staff.[46]

*We agree that it is useful for investors to understand how the board considers and addresses diversity, as well as the board's assessment of the implementation of its diversity policy, if any. Consequently, we are adopting amendments to Item 407(c) of Regulation S-K to require disclosure of whether, and if so how, a nominating committee considers*

[44] *See, e.g.,* letters from Board of Directors Network, Boston Common Asset Management, CalPERS, CalSTRS, Calvert, Council of Urban Professionals, Ernst & Young LLP ("E&Y"), Greenlining Institute, Hispanic Association on Corporate Responsibility, Interfaith Center on Corporate Responsibility, InterOrganization Network, Latino Business Chamber of Greater Los Angeles, Pax World Management Corporation, Prout Group, Inc., RiskMetrics, Sisters of Charity BVM, Sisters of St. Joseph Carondelet, and Trillium Asset Management Corporation.

[45] *See, e.g.,* letters from the Boston Club, Boston Common Asset Management, CalPERS, Pax World Management Corporation, Trillium Asset Management Corporation, and Social Investment Forum.

[46] *See, e.g.,* letters from Catalyst and the Social Investment Forum.

SHAREHOLDER DERIVATIVE COMPLAINT

*diversity in identifying nominees for director*.[47] In addition, if the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, disclosure would be required of how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[48]

172.   In further expanding on the importance and materiality to investors of the new diversity disclosures mandated by the 2009 rule, the SEC stated:

Required disclosure of whether, and if so, how a nominating committee (or the board) considers diversity in connection with identifying and evaluating persons for consideration as nominees for a position on the board of directors may also benefit investors. ***Board diversity policy is an important factor in the voting decisions of some investors.[49] Such investors will directly benefit from diversity policy disclosure*** to the extent the policy and the manner in which it is implemented is not otherwise clear from observing past and current board

---

[47] *See* Item 407(c)(2)(vi) of Regulation S-K. Funds will be subject to the diversity disclosure requirement of Item 407(c)(2)(vi) of Regulation S-K under Item 22(b)(15)(ii)(A) of Schedule 14A. *See* 17 CFR 240.14a-101, Item 22(b)(15)(ii)(A).

[48] *See* United States Securities & Exchange Commission, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, Dec. 16, 2009, available at https://www.sec.gov/rules/final/2009/33-9089.pdf, last visited July 25, 2020.

[49] *See, e.g.,* letters from Calvert, Trillium, Boston Common Asset Management, CII, Florida State Board of Administration, and Sisters of Charity BVM. *See also* letter from Lissa Lamkin Broome and Thomas Lee Hazen.

SHAREHOLDER DERIVATIVE COMPLAINT

selections.  Although the amendments are not intended to steer behavior, ***diversity policy disclosure may also induce beneficial changes in board composition***. A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity. Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality. ***To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company, the resulting increase in board independence could potentially improve governance***.  In addition, in some companies a policy of increasing board diversity may also improve the board's decision-making process by encouraging consideration of a broader range of views.[50]

173.  As a result of the 2009 rule enacted by the SEC, Item 407 of Regulation S-K now requires all companies in their proxy statements to:

Describe the nominating committee's process for identifying and evaluating nominees for director, including nominees recommended by security holders, and any differences in the manner in which the nominating committee evaluates nominees for director based on whether the nominee is recommended by a

---

[50] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

security holder, and whether, and if so how, the nominating committee (or the board) considers diversity in identifying nominees for director. If the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, describe how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[51]

174.  As set forth herein, the Company has not complied with these requirements in its Proxy Statements and thus has denied its shareholders key, material information about how the Company's nominating and governance committee considers diversity in identifying nominees for directors.

### F. False and Misleading 2019 and 2020 Proxy Statements Approved by the Director Defendants

175.  Notwithstanding their knowledge about Monster's failure to promote and achieve diversity and its discriminatory hiring and promotion practices, the Director Defendants caused Monster to issue Proxy Statements that were materially misleading.

176.  The Company's 2019 Proxy Statement was filed with the SEC on April 22, 2019 and was approved by Defendants Sacks, Schlosberg, Hall, Ciaramello, Fayard, Jackson, Pizula, Polk, Selati, and Vidergauz.  The 2019 annual meeting was held in California.  The members of the Company's Nominating and Corporate Governance Committee in 2019 at the time the 2019 Proxy was filed with the SEC and sent to the Company's shareholders

---

[51] *See* Item 407(c)(2)(vi) of Regulation S-K, 17 CFR §229.407.

SHAREHOLDER DERIVATIVE COMPLAINT

were Directors Selati, Taber, and Epstein.

177.   The Company's 2020 Proxy Statement was filed with the SEC on April 21, 2020 and was approved by Defendants Sacks, Schlosberg, Hall, Fayard, Polk, Selati, and Vidergauz.   The members of the Company's Nominating and Corporate Governance Committee in 2020 at the time the 2020 Proxy was filed with the SEC and sent to the Company's shareholders were Directors Selati, Polk, and Vidergauz.

178.   In the 2019 and 2020 Proxy Statements, the Company stated that:

> *[T]he Nominating and Corporate Governance Committee reviews the desired experience, mix of skills and other qualities to assure appropriate Board composition*, taking into account the current Board members and the specific needs of the Company and the Board. Among the qualifications to be considered in the selection of candidates, the Nominating and Corporate Governance Committee considers the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as well as such candidate's past or anticipated contributions to the Board and its committees so that *the Board includes members, where appropriate, with diverse backgrounds*, knowledge and skills relevant to the business of the Company. *The charter for the Nominating and Corporate Governance*

SHAREHOLDER DERIVATIVE COMPLAINT

*Committee specifically states that diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership*.[52]

179.   These statements were misleading.   The statement that "*The charter for the Nominating and Corporate Governance Committee specifically states that diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership*" misled shareholders into believing that the Board considers diversity an important factor in deciding which candidates to nominate for Board seats.  In reality, it is not an important factor and the Company is not committed to racial and ethnic diversity on the Board and among the Company's senior executives. The Company's affirmative representation that "diversity of race [and] ethnicity" are "*factors in evaluating suitable candidates for Board membership*" simply cannot be squared with the fact that the Company has never had an African American or other minority Board member.  Moreover, the Company's repeated statements about the high value that the Company places on diversity in its workforce, including at the senior executive level ("*We seek to capture diversity in our candidates, including diversity of gender, race and ethnicity, and veteran status. This applies across the organization, including at the senior management level*") simply cannot be squared with the fact that the Company has no racial or ethnic diversity among its senior executives.

---

[52] 2018 Proxy at p. 42; 2019 Proxy at p. 45; 2020 Proxy at p. 51-52.

SHAREHOLDER DERIVATIVE COMPLAINT

180.   These statements in the 2019 and 2020 Proxy Statements were also misleading because they suggested that the Governance Committee has a goal of achieving diversity on the Board by seeking to achieve representation of diverse persons – *i.e.*, Blacks and other minorities.   In reality, however, the Governance Committee does not have a goal of increasing the racial diversity of applicants for Board seats and instead merely seeks to create a misleading veneer of commitment to diversity.

181.   The 2019 and 2020 Proxy Statements were also misleading because they suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership.  Despite stating that the Nominating and Governance Committee considers racial and ethnic diversity when recommending candidates to the Board, the fact remains that Monster has no African Americans on its Board, and that no African American or other minority candidate has been elected to the Monster Board. The undisclosed truth therefore is that Monster has no intention to actually nominate African Americans or other minorities to its Board.

182.   The false, misleading, and omitted information about diversity was highly material, violated SEC rules governing proxy statements.   In passing the 2009 rule, the SEC stated:

In the Proposing Release, we also requested comment on whether we should amend our rules to require disclosure of additional factors considered by a nominating committee when selecting someone for a board position, such as board diversity. A significant number of commenters responded that disclosure

SHAREHOLDER DERIVATIVE COMPLAINT

about board diversity was important information to investors.[53] Many of these commenters believed that requiring this disclosure would provide investors with information on corporate culture and governance practices that would enable investors to make more informed voting and investment decisions.[54] Commenters also noted that there appears to be a meaningful relationship between diverse boards and improved corporate financial performance, and that diverse boards can help companies more effectively recruit talent and retain staff.[55] *We agree that it is useful for investors to understand how the board considers and addresses diversity, as well as the board's assessment of the implementation of its diversity policy, if any. Consequently, we are adopting amendments to Item 407(c) of Regulation S-K to require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for director.*[56] In addition, if the nominating committee

[53] *See, e.g.*, letters from Board of Directors Network, Boston Common Asset Management, CalPERS, CalSTRS, Calvert, Council of Urban Professionals, Ernst & Young LLP ("E&Y"), Greenlining Institute, Hispanic Association on Corporate Responsibility, Interfaith Center on Corporate Responsibility, InterOrganization Network, Latino Business Chamber of Greater Los Angeles, Pax World Management Corporation, Prout Group, Inc., RiskMetrics, Sisters of Charity BVM, Sisters of St. Joseph Carondelet, and Trillium Asset Management Corporation.

[54] *See, e.g.*, letters from the Boston Club, Boston Common Asset Management, CalPERS, Pax World Management Corporation, Trillium Asset Management Corporation, and Social Investment Forum.

[55] *See, e.g.*, letters from Catalyst and the Social Investment Forum.

[56] *See* Item 407(c)(2)(vi) of Regulation S-K. Funds will be subject to the diversity disclosure requirement of Item 407(c)(2)(vi) of Regulation S-K under Item 22(b)(15)(ii)(A) of Schedule 14A. See 17 CFR 240.14a-101, Item 22(b)(15)(ii)(A).

SHAREHOLDER DERIVATIVE COMPLAINT

(or the board) has a policy with regard to the consideration of diversity in identifying director nominees, disclosure would be required of how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[57]

183. In further expanding on the importance and materiality to investors of the new diversity disclosures mandated by the 2009 rule, the SEC stated:

Required disclosure of whether, and if so, how a nominating committee (or the board) considers diversity in connection with identifying and evaluating persons for consideration as nominees for a position on the board of directors may also benefit investors. ***Board diversity policy is an important factor in the voting decisions of some investors.[58] Such investors will directly benefit from diversity policy disclosure*** to the extent the policy and the manner in which it is implemented is not otherwise clear from observing past and current board selections. Although the amendments are not intended to steer behavior, ***diversity policy disclosure may also induce beneficial changes in board composition***. A board may determine, in

---

[57] *See* United States Securities & Exchange Commission, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, Dec. 16, 2009, available at https://www.sec.gov/rules/final/2009/33-9089.pdf, last visited July 25, 2020.

[58] *See, e.g.,* letters from Calvert, Trillium, Boston Common Asset Management, CII, Florida State Board of Administration, and Sisters of Charity BVM. *See also* letter from Lissa Lamkin Broome and Thomas Lee Hazen.

85

connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity. Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality. ***To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company, the resulting increase in board independence could potentially improve governance***. In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[59]

184.  As a result of the 2009 rule enacted by the SEC, Item 407 of Regulation S-K now requires all companies in their proxy statements to:

Describe the nominating committee's process for identifying and evaluating nominees for director, including nominees recommended by security holders, and any differences in the manner in which the nominating committee evaluates nominees for director based on whether the nominee is recommended by a security holder, and whether, and if so how, the nominating committee (or the board) considers diversity in identifying

---

[59] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

nominees for director. If the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, describe how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[60]

185. The Nominating & Governance Committee at Monster is responsible for nominating candidates to the Board. The Company's 2020 Proxy stated that:

> [T]he Nominating and Corporate Governance Committee reviews the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the Board. Among the qualifications to be considered in the selection of candidates, the Nominating and Corporate Governance Committee considers the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as well as such candidate's past or anticipated contributions to the Board and its committees so that the Board includes members, where appropriate, with diverse backgrounds, knowledge and skills relevant to the business of the Company. The charter for the Nominating and Corporate Governance Committee specifically states that diversity of race, ethnicity,

---

[60] *See* Item 407(c)(2)(vi) of Regulation S-K, 17 CFR §229.407.

SHAREHOLDER DERIVATIVE COMPLAINT

1
2

gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership [61]

3
4
5
6
7

186.   At Monster, one of the ways the Company has inhibited and prevented diverse candidates from being nominated to serve on the Board is through restrictive and unreasonable provisions that place a high bar on shareholders' ability to nominate candidates other than the incumbent directors.  As admitted in the 2020 Proxy:

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

In 2018, the Board adopted the Proxy Access Bylaw. ***The Proxy Access Bylaw permits a stockholder, or a group of up to twenty stockholders, owning three percent or more of the Company's outstanding Common Stock continuously for at least three years to nominate and include in the Company's proxy materials***. Director nominees consisting of two nominees or twenty percent of the Board, whichever is greater, provided that the stockholder(s) and nominee(s) comply with the requirements of Article 1, Section 16 of our By-Laws. To be timely for inclusion in the Company's proxy materials for our 2020 annual meeting, pursuant to the Proxy Access Bylaw, the stockholder(s) notice to nominate a Director must be delivered to the Office of the Secretary at the Company's principal executive offices no earlier than November 24, 2019 and no later than December 24, 2019. The notice must contain the information required by our By-Laws, and the stockholder(s)

25
26

[61] *See* 2020 Proxy at p. 51-52.

27
28

SHAREHOLDER DERIVATIVE COMPLAINT

and nominee(s) must comply with the information and other requirements in our By-Laws relating to the inclusion of stockholder nominees in our proxy materials.[62]

187.  As this statement indicates, any Monster shareholder wanting to nominate a new individual to the Board — for example, an African American individual — has to own 3% of the Company's stock, or alternatively somehow get in contact with and convince 19 other shareholders who collectively own 3% of the Company's stock to agree to nominate the individual.  The Company's 2020 Annual Report disclosed that "Holders of record of Common Stock at the close of business on April 13, 2020 are entitled to notice of, and to vote at, the Annual Meeting. Each share entitles its holder to one vote. As of the record date, 526,547,394 shares of our Common Stock were issued and outstanding. There are no other outstanding voting securities of the Company.  Thus, 3% of Monster's shares equates to 15,796,422 shares."

188.  At Monster's current stock price of approximately $84.54,[63] a shareholder would have to own $1,335,429,516 in Monster stock in order to have the right to nominate an African American individual to Monster's Board.  No wonder there are no Blacks on Monster's Board.

189.  But the restrictions do not end there.  In addition to having to own 3% of Monster's stock, a shareholder has to have owned the stock "continuously for at least the last three years."  So, there is a three-year waiting period even after a person buys Monster stock in order to be able to

---

[62] *See* 2020 Proxy at p. 11.
[63] As of August 28, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

nominate a director to the Board.

190.  Monster's Proxy Statement was also materially misleading because it contained material omissions: it failed to disclose that the purpose and effect of its "proxy access" rules, in combination with the policies of its Nominating & Governance Committee, was to inhibit the nomination and election of Blacks and minorities to the Board.  These material omissions would have been material to a shareholder's decision as to whether to re-elect the incumbent directors at the annual meeting.  In the 2019 and 2020 Proxy Statements, the reelection of the incumbent directors was Item No. 1.

191.  In the 2019 and 2020 Proxy, the nominated directors were Sacks, Schlosberg, Hall, Fayard, Polk, Selati, Jackson, Polk, Pizula, and Vidergauz.

192.  The Proxy Statements were also materially misleading because they failed to disclose that the Company does not have term limits, and that the purpose of the lack of term limits is to entrench the current directors in office and prevent African Americans and minorities from having fair opportunities to be elected to the Board.

193.  To attempt to justify its racism, Monster's Board has resisted efforts to appoint new members to its Board by claiming that the individuals who have served on the Board for, in some cases more than a decade, have experience that is valuable to the Company. The Proxy was false and misleading for failing to disclose the lack of term limits and the true reasons and effect of the lack of term limits.

194.  In reality, longer-tenured directors do not serve the best interests of the Company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance noted that:

SHAREHOLDER DERIVATIVE COMPLAINT

Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.[64]

195.  The Director Defendants' refusal to adopt director term limits and to appoint new Black and minority members to the Board represents explicit or implicit racism at Monster, and an improper pretext for failing to add Black and minority individuals to the Board.

196.  The 2019 and 2020 Proxy Statements were also materially misleading because they asked shareholders to vote in favor of executive compensation "say on pay" proposals, but failed to disclose that none of Monster's executive compensation decisions take into consideration

---

[64] *Available at* https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms/ (last visited June 21, 2020).

SHAREHOLDER DERIVATIVE COMPLAINT

whether the executives have been successful in achieving the Company's critical goals of increasing diversity and inclusion at the Company, ensuring compliance with the law, eliminating legal and reputational risks to the Company, ensuring compliance with the Company's internal controls, and eliminating sexual harassment and discrimination.

197.   The 2019 Proxy contained a report from the Compensation Committee regarding executive compensation and risk management.   The members of the Compensation Committee at the time who issued the report which was included in the 2019 Proxy were Directors Epstein, Vidergauz, and Selati.   The Proxy stated that "The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K.   Based on such review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis referred to above be included in this proxy statement."

198.   The 2019 Proxy stated:

**PROPOSAL THREE**

**ADVISORY VOTE ON EXECUTIVE COMPENSATION**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") enables our stockholders to approve, on a non-binding, advisory basis, the compensation of our Named Executive Officers as disclosed in this proxy statement in accordance with SEC rules.

*Our executive compensation program for our Named Executive Officers is designed to motivate our executive talent*, to reward those individuals fairly over time for achieving performance goals, *to retain those individuals who continue to perform at or*

SHAREHOLDER DERIVATIVE COMPLAINT

*above the levels that are deemed essential to ensure our long-term success and growth* and to attract, as needed, individuals with the skills necessary for us to achieve our business plan. *We believe our compensation policies are designed to reinforce a sense of ownership and overall entrepreneurial spirit and to link rewards to measurable corporate and qualitative individual performance*. In addition, the Compensation Committee has made several key enhancements this year to our compensation program in response to feedback from stockholders.

199.   The 2019 Proxy acknowledged that executive compensation decisions were largely based on discretionary, non-objective factors, but failed to provide a full description of the factors considered (or not considered) by the Compensation Committee.  The 2019 Proxy stated:

*Compensation Philosophy*

*Our executive compensation program for our Named Executive Officers* ("NEOs"), as described in the following pages, *is designed* to emphasize equity compensation in the form of stock options, restricted stock and/or restricted stock units in addition to cash compensation *as a means of motivating and retaining executive talent, rewarding executives fairly over time for performance relative to business plan goals and creating sustainable shareholder value through continued profitable growth.  The program is designed to reinforce ownership and overall entrepreneurialism and to link rewards to measurable corporate and qualitative individual performance*.  The program, although not formulaic in its approach, is based on long-standing principles that reward sustained, relative

SHAREHOLDER DERIVATIVE COMPLAINT

outperformance.   ***When making compensation decisions, the Company's performance versus its internal goals and external benchmarks are considered.   Consideration is also given to operating performance and shareholder returns, as well as each NEO's role in enhancing operating performance and shareholder returns***.   In applying these principles, we integrate cash and equity incentive compensation programs with our short- and long-term strategic plans in order to align the interests of our NEOs with the long-term interests of our stockholders.   ***The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking***.

200.   With respect to the award of annual bonuses to the Company's executives, the 2019 Proxy stated that the bonuses were "discretionary" and based on a "qualitative" review of performance, but failed to fully disclose what factors were considered and which were not considered in this qualitative review:

We provide incentive compensation to our NEOs partly in the form of a ***discretionary annual cash bonus based on a qualitative review of individual and company-wide financial and operational performance***, consistent with our emphasis on pay-for-performance incentive compensation programs.   The Compensation Committee determines the annual bonuses for Mr. Sacks and Mr. Schlosberg and the Executive Committee (comprised of the Chairman and Chief Executive Officer and the Vice Chairman and President) determines the annual bonuses

SHAREHOLDER DERIVATIVE COMPLAINT

for the other NEOs.

Consistent with prior years, the 2018 cash bonuses were not determined in a formulaic manner.  In determining 2018 bonus awards, our Compensation Committee and Executive Committee considered all of our performance achievements and reviewed various strategic factors, including sales revenues, high relative profit growth, distribution levels, introduction of new products, corporate partnerships, overall operating performance, contribution margins, profitability and TSR, which are used as a broad guide of overall performance.  We generally utilize annual cash bonuses to reward performance for the time horizon of one year.

201.   The 2019 Proxy stated the following with respect to the Company's Long-Term Incentive equity awards:

***Long-Term Incentive Program***

We believe that long-term performance is achieved through an ownership culture that encourages superior performance by our NEOs through the use of equity awards and, as a result, the compensation program emphasizes equity awards over cash compensation.  ***Our equity compensation plans have been established to provide our NEOs with incentives to further align their interests with the interests of our stockholders and such interests are aligned through the granting of options and restricted stock units***.  Equity compensation to our NEOs generally vests over three to five years.

202. The 2019 Proxy also affirmatively represented that the Compensation Committee carefully considered risk and risk management

SHAREHOLDER DERIVATIVE COMPLAINT

when making compensation decisions:

> *The Compensation Committee reviews the Company's compensation practices and discerns the relationship among risk, risk management and compensation in light of the Company's objectives*.

203.   These statements about executive compensation were false and misleading.  The statements suggested that the Compensation Committee's executive compensation decisions took into consideration the best long-term interests of the Company, which implied that a review of the executives' success or lack of success in causing the Company to comply with the law and ensure that the Company was adopting and employing effective internal controls and achieving the Company's strategic goals, including those of increasing diversity at the Company.  In reality, however, those factors were not considered in any way by the Compensation Committee in its qualitative and discretionary analysis of executive compensation.  In fact, upon information and belief, the Compensation Committee's decisions were based almost 100% on the Company's financial performance.  As a result, the Proxy was false and misleading because it misrepresented that the Compensation Committee considered risk management when approving executive compensation programs and when approving executive compensation.

204.  The statement in the 2019 Proxy that "*The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking*" was also false and misleading.  Because the undisclosed truth was that the Compensation Committee did not factor legal compliance and compliance with the

SHAREHOLDER DERIVATIVE COMPLAINT

Company's internal controls into its compensation decisions, the Company's executive compensation program necessarily entailed excessive risks since the Company's executives were motivated to boost financial performance at any cost and regardless of legal compliance.  The rampant sexual harassment and lack of diversity at the Company are flagrant and obvious examples of the results of the Company's compensation program lacking any consideration of executives' success (or lack thereof) in ensuring legal compliance and ensuring effective internal controls at the Company. At Monster, even executives like Brent Hamilton who strangled and bit women were allowed to remain in their posts for years after their criminal conduct.  Since the Company's financial performance was the only factor considered by the Compensation Committee, male executives who engaged in this deplorable conduct could still keep their jobs and earn bonuses despite engaging in clearly illegal, unethical, immoral, and disgusting conduct towards women.  The Company even exalted such conduct by naming one of its drinks "Assault."

205.  At the 2019 Annual Meeting, the Company only received 64% support for its "Say on Pay" proposal regarding executive compensation – a very low percentage by industry standards.

206.  In the 2020 Proxy, the Company announced that it had changed its approach to executive compensation from a completely "discretionary" basis to a "formulaic" one:

> **The Compensation Committee's prior practice was to determine annual incentive payouts on an entirely discretionary basis. Beginning with the 2020 fiscal year, the Compensation Committee transitioned to a formulaic approach**, whereby each NEO has a pre-established target bonus opportunity which will

SHAREHOLDER DERIVATIVE COMPLAINT

be earned based on pre-established financial and individual performance, weighted 75% and 25%, respectively.[65]

207.   The 2020 Proxy further stated:

The key elements of the 2020 annual incentive program are as follows:

·      in March 2020, the Compensation Committee granted the 2020 annual incentive award to the NEOs with a target bonus opportunity ranging from 50% to 120% of each NEO's 2020 base salary (the "2020 Award");

·      payouts for the 2020 Award are dependent upon adjusted operating income (75% weighting) and individual performance (25% weighting);

·      with respect to both the Company's adjusted operating income and the individual performance components, the payout may range from 0% to 200% of target, and no payout will be earned for performance below a threshold level; and

·      achievement under either of these components are independent of each other (*i.e.*, a payout can be made under one component even if no payout is made under the other).

208.   The 2020 Proxy also stated that Monster Beverage had re-designed its long-term incentive compensation program:

*Change #2 - Long-Term Incentive Re-Design*

The Compensation Committee historically made annual grants to our NEOs consisting of a mix of stock options and time-

---

[65] *See* 2020 Proxy Statement at p. 21.

SHAREHOLDER DERIVATIVE COMPLAINT

vested RSUs for its long-term incentive program. With the assistance of F.W. Cook, the Compensation Committee approved in March 2020 a new ongoing long-term incentive program structure for all NEOs consisting of stock options (25% weighting), time-vested RSUs (25% weighting) and performance share units ("PSUs") (50% weighting). The stock options will vest ratably over three or five years, subject to continued service, and will have a 10-year term. The RSUs will also vest ratably over three or five years, subject to continued service. The PSUs will cliff vest after three years based on performance achievement versus the pre-established performance goal, subject to continued service during the period.

209.  Similar to the 2019 Proxy, the 2020 Proxy Statement contained the following representation:

> *The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking.*

210.  The 2020 Proxy also affirmatively represented that the Compensation Committee carefully considered risk and risk management when making compensation decisions:

> *The Compensation Committee reviews the Company's compensation practices and discerns the relationship among risk, risk management and compensation in light of the Company's objectives.*

211.  This statement was misleading because it led shareholders to believe that the Compensation Committee's compensation decisions were

SHAREHOLDER DERIVATIVE COMPLAINT

structured to ensure that the Company's executives were not incentivized to take excessive risks that could lead the Company to incur liability and reputational harm. The Proxy was also misleading because it omitted to disclose the truth, which is that the Company's compensation programs for executives completely fail to take into consideration risk or risk management.

212. The 2020 Proxy also stated that the Board is directly responsible for risk management:

**The Board's Role in Risk Oversight**

*The Board of Directors plays an active role in overseeing and managing the Company's risks. The full Board and its Executive Committee regularly review the Company's results, performance, operations, competitive position, business strategy, liquidity, capital resources, product distribution and development, material contingencies and senior personnel, as well as the risks associated with each of these matters. The Board implements its risk oversight function both as a whole and through its standing committees*. Certain of the work is delegated to committees, which meet regularly and report back to the full Board. *The Compensation Committee reviews the Company's compensation practices and discerns the relationship among risk, risk management and compensation in light of the Company's objectives. The Audit Committee reviews and discusses with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including* the Company's major financial risk exposures and risks

SHAREHOLDER DERIVATIVE COMPLAINT

*related to financial statements, the financial reporting process and accounting* and **legal matters, as well as the steps management has taken to monitor and control such exposures**. The full Board also discusses risk throughout the year during meetings in relation to specific proposed actions including risks related to cybersecurity and reputation. *These processes are designed to ensure that risks are taken knowingly and purposefully. The Board believes that its role in oversight of risk management (as well as the role of the Compensation Committee and the Audit Committee) has not adversely affected its leadership structure or results of operations*.

213.   These statements regarding executive compensation in the 2020 Proxy Statement were contained in the Report from the Compensation Committee, whose members at the time (and currently) are Defendants Vidergauz, Selati, and Polk.

214.   The statement in the 2020 Proxy that *"**The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking**"* was false and misleading.   Because the undisclosed truth was that the Compensation Committee did not factor legal compliance into its compensation decisions, the Company's executive compensation program necessarily entailed excessive risks since the Company's executives were motivated to boost financial performance at any cost and regardless of legal compliance.   The rampant sexual harassment and lack of diversity at the Company are flagrant and obvious examples of the results of the Company's compensation program lacking any consideration of executives' success (or lack thereof) in ensuring legal compliance and ensuring effective internal

SHAREHOLDER DERIVATIVE COMPLAINT

controls at the Company.

215.   The members of the Audit Committee at the time the 2020 Proxy was filed with the SEC and sent to shareholders were Fayard, Pizula, and Selati.  The members in 2019 were Selati, Epstein, Taber and Fayard.

216.   The omitted facts, had they been disclosed, would have been highly material to stockholders' decisions as to whether to reelect the Board nominees and vote in favor or against the "say on pay" executive compensation proposals.   Ensuring that a company's executive compensation programs do not entail excessive risk taking is critical to shareholders, since excessive risk taking may maximize compensation to the executives yet result in liability to the Company that far exceeds the amount of the compensation paid to the executives.  A company's success (or lack thereof) in achieving diversity and inclusion is also valued very highly by shareholders, including Plaintiff, and the omitted fact that Monster does not include any significant weight (if any) to executives' success or lack thereof in achieving legal compliance and the Company's diversity goals would have been very important to shareholders' voting deliberations.

217.   The false statements and material omissions in the Proxy Statements had their desired effect.  At Monster's annual meetings in 2019 and 2020 all the incumbent white directors were reelected.  No competing Black or minority candidates made it on the ballot or were elected.  The executive compensation "say on pay" proposals were approved.

218.   The 2019 and 2020 Proxy Statements were false and misleading because, among other things, they omitted and failed to disclose:

(a)   That the statement in the Proxies that "the Nominating and Corporate Governance Committee considers

SHAREHOLDER DERIVATIVE COMPLAINT

the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as well as such candidate's past or anticipated contributions to the Board and its committees so that the Board includes members, where appropriate, with diverse backgrounds, knowledge and skills relevant to the business of the Company" was misleading because it suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership, while the undisclosed reality is that Monster either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool;

(b)     That the Company's lack of term limits is not due to a desire to retain the experience of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c)     That the Company's failure to disclose its median salary and pay/employment data is due to a desire to conceal existing, known pay disparity at the Company which adversely affects women and minorities;

(d)     That the Company's executive compensation decisions do not take into consideration in any way the executives' success or lack thereof in achieving the Company's diversity and inclusion goals; moreover, that the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with, and that

SHAREHOLDER DERIVATIVE COMPLAINT

the Company's executives were retaliating against female employees such as  Jamie Hogan and Fran Pulizzi;

(e)     That the Board's Nominating and Governance Committee does not take racial and ethnic diversity into consideration when nominating Board candidates and instead simply has attempted to create a false appearance of seeking diversity among potential Board candidates;

(f)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect women and minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

(g)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to sexual harassment, diversity and inclusion were being complied with;

(h)     That the statement in the Proxies that *"The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking"* was false and misleading. Because the undisclosed truth was that the Compensation Committee did not factor legal compliance into its compensation decisions, the Company's executive compensation program necessarily entailed excessive risks since the Company's executives were motivated to boost financial performance at any cost and regardless of legal compliance; and

104

(i)   That   the   Company's   diversity   and   inclusion programs were not achieving measurable and actionable results, and needed substantial improvement.

219.   The 2019 and 2020 Proxy Statements harmed the Company by interfering   with   the   proper   governance   on   its   behalf   that   requires stockholders' informed voting regarding directors. As a result of the false or misleading statements in the Proxies, stockholders voted to reelect all of the Defendants to the Board in 2019 and 2020.

220.   The statements in the 2019 and 2020 Proxy Statements conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability."  In reality, the   Company's   corporate   governance   structure   and   defective   internal controls   allowed   senior   executives   and   the   Board   to   sidestep   real accountability   and   instead   continue   perpetuating   the   discriminatory practices in hiring practices, and lack of diversity on both the Board and management.

221. The   2018   and   2019   Proxies,   which   contained   materially misleading   statements   and   thus   deprived   shareholders   of   adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to reelect all of the Defendants to the Board and approve   executive   compensation   proposals   while   the   Defendants   were breaching   their   fiduciary   duties   to   the   Company   and   deliberately concealing material information concerning the Company's discrimination against   Black   and   other   minority   individuals   and   its   effects   on   the Company's business and reputation.

SHAREHOLDER DERIVATIVE COMPLAINT

### G.     Monster's Nominating and Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board

222.     The Charter of the Nominating and Governance Committee sets forth the duties of the Board members serving on such committee.  Among those duties, with respect to the nomination of candidates to serve on Monster's Board, are the following:

> In connection with the process of selecting and nominating candidates for election to the Board, the Committee shall review the desired experience, mix of skills and other qualities to assure appropriate Board composition, taking into account the current Board members and the specific needs of the Company and the Board.  Among the qualifications to be considered in the selection of candidates, the Committee shall consider the following attributes and criteria of candidates: experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments, dedication, independence and such other factors that the Committee considers appropriate so that the Board includes members, where appropriate, with diverse backgrounds, skills and experience, including appropriate financial and other expertise relevant to the business of the Company. Diversity of race, ethnicity, gender, sexual orientation and gender identity are factors in evaluating suitable candidates for Board membership. The Committee will consider diverse candidates in the pool from which Board nominees are chosen,

SHAREHOLDER DERIVATIVE COMPLAINT

including, without limitation, nominees from both corporate positions beyond the executive suite and nontraditional environments.[66]

223.   The members of the Nominating and Governance Committee (Polk, Selati, and Vidergauz) have breached their fiduciary duties as directors by failing to fulfill these duties.  Rather than causing Monster to comply with its corporate governance principles, Polk, Selati, and Vidergauz have caused Monster to merely pay lip service to these principles.  Instead of recommending well-qualified Black and minority candidates to serve on Monster's Board, Polk, Selati, and Vidergauz have perpetuated the all-white Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to Monster.

224.   Moreover, to entrench themselves and their fellow directors in office, all the Director Defendants have opposed term limits in order to prevent the addition of qualified African Americans and other minorities to the Board.

225.   At all relevant times, Monster Beverage has had very poor corporate governance principles, as recognized by corporate governance experts.  For example, Censible states the following with respect to Monster's corporate governance principles:

Monster Beverage performs ***very poorly*** among its competitors on corporate governance. This score is determined by the company's

---

[66]*See   https://investors.monsterbevcorp.com/static-files/9aa8b2ab-c80a-448b-a764-7263cdb2acf0* , last visited August 19, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

accounting practices, executive pay, board organization and ownership structure.[67]

226.  As the saying goes, the rich get richer while the poor get poorer. Serving on Monster's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing. Many qualified Black and minority candidates would enjoy the prestige and compensation that comes with a position on Monster's Board.   The following chart sets forth the compensation earned by outside directors on Monster's Board in 2020:

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|
| | | | | | |

227.  The following table sets forth the compensation paid to the Company's directors in fiscal year 2019:

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|
| Benjamin M. Polk | 60,000 | 164,988 | - | - | 224,988 |
| Norman C. Epstein | 100,000 | 164,988 | - | - | 264,988 |
| Sydney Selati | 102,500 | 164,988 | - | - | 267,488 |
| Harold C. Taber, Jr. | 92,500 | 164,988 | - | - | 257,488 |
| Mark S. Vidergauz | 87,500 | 164,988 | - | - | 252,488 |
| Mark J. Hall (4) | - | - | 1,148,305 | 1,011,388 | 2,159,693 |
| Kathy N. Waller | 60,000 | 164,988 | - | - | 224,988 |
| Gary P. Fayard | 70,000 | 164,988 | - | - | 234,988 |

[67]  *See*  https://esg.censible.co/companies/Monster-Beverage-environmental-social-corporate-governance-profile, last visited Aug. 24, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

228.   In addition to awarding themselves substantial compensation for serving on the Board, the Director Defendants lavished the Company's executives with the following compensation in fiscal years 2017, 2018, and 2019:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($)(2) | All Other Compensation ($)(3) | Total ($)(4) |
|---|---|---|---|---|---|---|---|
| Rodney C. Sacks Chairman, CEO and Director | 2019 2018 2017 | 850,000 800,000 750,000 | 508,000 484,000 462,000 | 6,486,726 6,464,411 5,645,403 | 6,012,646 6,063,050 5,550,232 | 125,062 103,470 97,445 | 13,982,434 13,914,931 12,505,080 |
| Hilton H. Schlosberg Vice Chairman, CFO, COO, President, Secretary and Director | 2019 2018 2017 | 850,000 800,000 750,000 | 508,000 484,000 462,000 | 6,486,726 6,464,411 5,645,403 | 6,012,646 6,063,050 5,550,232 | 81,927 73,746 44,652 | 13,939,299 13,885,207 12,452,287 |
| Guy P. Carling President, EMEA | 2019 2018 | 549,652 507,469 | 278,154 227,406 | 507,195 618,000 | 504,393 1,641,318 | 45,557 44,778 | 1,885,951 3,039,171 |
| Thomas J. Kelly Executive Vice President, Finance, MEC | 2019 2018 2017 | 450,000 400,000 350,000 | 225,000 200,000 180,000 | 310,284 - - | 302,636 1,239,216 - | 38,781 36,408 33,667 | 1,326,701 1,875,624 563,667 |
| Emelie C. Tirre President, Americas | 2019 2018 | 630,000 554,615 | 320,000 275,000 | 507,195 618,000 | 504,393 1,641,318 | 35,345 33,645 | 1,996,933 3,122,778 |

229.   These huge salaries to the Company's executives have been awarded by the Compensation Committee Directors (Polk, Selati, and Vidergauz) while systematically underpaying minorities and women.  The Compensation Committee Defendants have consistently awarded massive pay packages to the Company's CEOs which dwarf the median pay of the Company's other employees.  The pay of the Company's CEO in fiscal year 2020 was 253 times as high as the median pay of all other employees:

> Based on this information, for 2019, the ratio of the compensation of the Chief Executive Officer to the median annual total compensation of all other employees (other than the Chief Executive Officer) was estimated to be 253:1.[68]

---

[68] *See* Monster 2020 Proxy Statement at p. 47.

SHAREHOLDER DERIVATIVE COMPLAINT

**H.     The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination**

230.   The Director Defendants have known for years that Monster has been violating federal and state laws regarding diversity, equal pay, and discrimination against women and minorities.

231.   Defendants' knowledge is reflected by the fact that the lawsuits filed by at least five former female employees allege that: (1) Monster paid women less than men for the same or similar jobs and refused to provide stock options to women; and (2) Monster illegally retaliated against numerous women who reported sexual harassment and discrimination by Company executives, in violation of the Company's own alleged "zero tolerance" policy and federal and state laws making such retaliation illegal.

232.   As just one of many examples, former employee Jamie Leigh Hogan was discriminated against because she was a woman, was paid less than male workers, and was constructively discharged after reporting the discrimination to Company executives, including David van Winkle, Vice President.  Her supervisor, Phil Dietrich, Central Division On-Premise Food Service Manager, directly discriminated against Hogan because she was a woman and violated federal and state laws by disclosing private details about Hogan's medical issues and a leave of absence to co-workers in an effort to embarrass and undermine Hogan.  When Hogan filed a complaint with the Company's Human Resources department, the department disclosed Hogan's complaints to Dietrich in violation of Company policy.[69]

---

[69] *See Hogan v. Monster Energy Company*, Case No. 17-cv-02156 (N.D. Texas).

SHAREHOLDER DERIVATIVE COMPLAINT

To avoid public disclosure of further facts regarding the Company's wrongdoing, Monster forced Hogan to arbitrate her claims and insisted upon the sealing of all further information.

233. The Director Defendants continued to approve the Company's policy of mandating arbitration of female employees' claims of sexual harassment and discrimination in order to keep this and similar wrongdoing concealed and shielded from public inquiry. This represented a breach of the Director Defendants' fiduciary duty of loyalty and good faith, since the mandatory arbitration policy, coupled with mandatory confidentiality provisions which preclude female employees from publicly reporting the wrongdoing, allowed the male executives such as Kenneally and Dietrich and many others to persist in their disgusting, demeaning misconduct towards women, thereby exposing the Company to liability, materially harming its reputation, and causing severe emotional distress and economic harm to a key element of the Company's workforce – female employees.

234. The Director Defendants knew that Monster had not corrected these problems with respect to rampant, long-standing, and egregious sexual harassment and discrimination of women, fair and equitable pay to women and minorities, unlawful retaliation and violation of Company HR policies, and lack of adequate internal controls at Monster regarding these issues.

235. In their efforts to avoid detailed disclosures that would shed light of the true extent of pay inequity at Monster afflicting African Americans and minorities, the Director Defendants continue to refuse to publish unadjusted median gender/racial pay information which is industry best practices and standards.

SHAREHOLDER DERIVATIVE COMPLAINT

236.   Monster has refused to publish annual diversity reports, thus enabling the Company to attempt to hide the lack of diversity.  The Director Defendants were aware of this and were complicit in these acts, thus demonstrating their scienter about Monster's failure to ensure diversity and failure to pay minorities equal pay.

## I.   The Unjust Compensation Awarded to Defendants Sacks and Schlosberg

237.   Defendants Sacks and Schlosberg received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying women, Blacks and minorities less.

238.   Much of the information about the exact amount of the unjust payments is not publicly available, and has been fraudulently concealed by Defendants.  As a result, Plaintiff requires discovery in order to properly allege the full extent and details of Defendants' wrongdoing.

239.   However, at a minimum, based on publicly available information, Defendants Sacks and Schlosberg have received substantial unjust compensation during the time the wrongdoing has occurred and persisted.

240.   Defendants' receipt of this compensation during the relevant time period was unjust in light of their direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct. Defendants' receipt of such compensation while knowingly or recklessly breaching their fiduciary duties to the Company constitutes unjust compensation that should be recouped by Monster.

241.   The tables set forth *supra* provide some additional information about some of Defendants' compensation during part of the relevant time period (*i.e.*, 2018-2020).

SHAREHOLDER DERIVATIVE COMPLAINT

242.   *In fiscal year 2018, the Company paid its CEO Sacks total compensation of $13,914,931*.   *In fiscal year 2019, the Company paid its CFO, COO, and President, Hilton H. Schlosberg, $13,939,299.*

243.   And the lack of diversity at the top at Monster has resulted in economic discrimination.   Defendants' compensation during the relevant period was also unjust because it significantly exceeded the average employees' pay, as disclosed by the Company in its Proxy. In fiscal year 2018, Defendant Sack's pay ratio was 253:1, as reported in the Proxy:

As reported in the Summary Compensation Table, **Mr. Sacks' annual total compensation for 2019 was $13,982,434**. In accordance with Item 402(u), we are using the same "median employee" identified in our 2019 and 2018 pay ratio calculations, as we believe that there has been no change in our employee population or employee compensation arrangements that we believe would result in a significant change to our pay ratio disclosure. See our 2019 and 2018 proxy statements for information regarding the process we utilized to identify our "median employee." We then identified and calculated the elements of this employee's total compensation for 2019 in accordance with the requirements of Item 402(c)(2)(x) of Regulation S-K, resulting in *a median annual total compensation of all employees of the Company and its subsidiaries (other than the Chief Executive Officer) of $55,169. Based on this information, for 2019, the ratio of the*

SHAREHOLDER DERIVATIVE COMPLAINT

***compensation of the Chief Executive Officer to the median annual total compensation of all other employees (other than the Chief Executive Officer) was estimated to be 253:1.***[70]

244.   Instead of acknowledging the problem and demanding change, Monster has instead issued false statements claiming success in achieving diversity and inclusion.

245.   If Defendant Sacks' 2019 pay was more than 253 times the median employees' compensation, then it was an even higher multiple of the median pay of Black and minority employees if Monster paid such employees less than other employees for similar jobs.

246.   When viewed in light of these facts, Defendants' compensation was unjust under equitable principles.

247.   Defendants' compensation detailed herein was unjust and should be disgorged or returned by them because they acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VIII. THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

248.   The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duties.

249.   As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining

---

[70] *See* Monster 2020 Proxy Statement at p. 47.

SHAREHOLDER DERIVATIVE COMPLAINT

to the lack of diversity at Monster, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

250. Moreover, Monster's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

251. Further, as a direct and proximate result of the Individual Defendants' actions, Monster has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Monster;

(b) costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused discrimination to proliferate at Monster;

(c) loss of reputation; and

(d) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Monster.

## IX. DEMAND FUTILITY

252. Plaintiff brings this action derivatively in the right and for the benefit of Monster to redress injuries suffered, and to be suffered, by Monster and its stockholders as a direct result of the Defendants' violations of federal securities laws and breaches of fiduciary duty.

253. Monster is named as a nominal defendant solely in a derivative capacity.

SHAREHOLDER DERIVATIVE COMPLAINT

254.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

255.   At the time this action was commenced, Monster's Board consisted of the following 10 members: Defendants Ciaramello, Fayard, Hall, Jackson, Pizula, Polk, Sacks, Schlosberg, Selati, and Vidergauz.

256.   Plaintiff has not made any demand on Monster to institute this action because such a demand would be a futile, wasteful, and useless act.

257.   Under Delaware law, demand is futile if a majority of the directors are either interested in or not independent of a person interested in the claims asserted.   Further, where a board is made up of an even number of directors, a majority of directors is considered to be half the Board.   Because Monster's Board is currently comprised of ten (10) directors, Plaintiff need only allege that demand is futile as to five (5) of the current Board members.

## A.   Demand on the Board is Excused as Futile

258.   The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including the Board knowingly and/or consciously presiding over the Company's discrimination and retaliation against women, Blacks and other minorities at Monster.   In their capacity as corporate directors, the Board members affirmatively adopted, implemented, and/or condoned a business strategy based on Monster's deliberate and widespread violations of law. The Board members cannot plausibly claim ignorance concerning these wide-ranging compliance failures. Indeed, the Board was specifically and uniquely accountable and responsible for the compliance failures discussed herein given that the Board was repeatedly made aware of the Company's failed internal controls and failure to comply with regulations.   The Company's Proxy Statements

SHAREHOLDER DERIVATIVE COMPLAINT

challenged in this case admit that the Defendants – the Company's Board of Directors – is directly responsible for risk oversight.

259.   Indeed, the lack of diversity challenged by this lawsuit pertains to the Board itself, which does not contain a single African American individual.   Moreover, when the Company hired an outside firm to investigate the wrongful termination of female employees who had been fired for reporting sexual harassment by male executives at the Company, the Board instructed the firm to report directly to it.   But before the investigation had even begun, the Board caused the Company to issue statements to the effect that the former female employees at the Company were merely "disgruntled employees" and that the Board was sure the Company would be vindicated in the investigation.   The Board thus acted in bad faith and is directly responsible for the wrongful conduct, including the establishment of a bogus investigation where the result was dictated by the Board from the outset.   All Board members are thus interested in the conduct alleged herein; they are alleged to have acted in bad faith and therefore are not independent or disinterested.   Their conduct represents a breach of the duty of loyalty, which cannot be indemnified by the Company.   All Board members therefore face a substantial likelihood of liability.

260.   Defendants Ciaramello, Fayard, Hall, Jackson, Pizula, Polk, Sacks, Schlosberg, Selati, and Vidergauz also all knew that the Company's Board composition was required to reflect the benefits of diversity, including diversity as to race and ethnicity.

261.   Despite having actual knowledge of this requirement, Defendants Ciaramello, Fayard, Hall, Jackson, Pizula, Polk, Sacks, Schlosberg, Selati, and Vidergauz all knew that, year after year, Monster did

117

not choose any racially or ethnically diverse candidates to be Board members.

262.   Rather than undertake their duty to investigate all complaints and concerns related to the wrongdoing at the Company and the Company's highly deficient internal controls, the Board took action to conceal the wrongdoing and make misrepresentations about the matters in the Company's public filings.  Such conduct in the face of information evidencing the systematic violations of applicable laws and regulations is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment — conduct for which the Individual Defendants should face potential personal liability. As such, the protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority. Accordingly, any demand on the Board to initiate this action would be futile.

**B.   Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising from Their Misconduct**

263.   Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

264.   As an initial matter, the Board has conceded in the Company's SEC filings, including its April 21, 2020 proxy statement, that Sacks and

118

Schlosberg are not independent directors of the Company. Specifically, Sacks is not independent and faces a substantial likelihood of liability because his principal occupation is serving as the Company's Chief Executive Officer.  Schlosberg is not independent and faces a substantial likelihood of liability because his principal occupation is serving as the Company's Chief Operating Officer.  Moreover, a significant portion of Sacks' and Schlosberg's compensation is incentive-based, which means that they were personally incentivized to perpetuate misconduct (such as that described herein) that artificially inflates the performance of the Company. As Monster executives, they had exposure to and knowledge of the wrongdoing alleged, including any "red flags." Sacks and Schlosberg cannot realistically distance themselves from the misconduct alleged herein. Sacks and Schlosberg are therefore incapable of impartially considering a demand to commence this action.

265.  Furthermore, Defendants Fayard, Pizula, and Selati have all been members of the Audit Committee during the relevant period, and are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the committee.  As stated in the 2020 Proxy Statement, "the Audit Committee assists the Board of Directors in fulfilling its oversight responsibilities with respect to:

· the integrity of the Company's financial statements;

· the Company's systems of internal controls regarding finance and accounting as established by management;

· the qualifications and independence of the independent registered public accounting firm;

· the performance of the Company's independent registered public accounting firm;

SHAREHOLDER DERIVATIVE COMPLAINT

· the Company's auditing, accounting and financial reporting processes generally; and

· compliance with the Company's ethical standards for senior financial officers and all personnel."

266.   In accordance with its charter, the Audit Committee also reviews the Company's policies and practices with respect to the financial reporting and control aspects of risk management, and must review the status of risk oversight activities performed by the Board and its other committees.

267.   As members of the Audit Committee, Defendants Fayard, Pizula, and Selati violated their fiduciary duties to act in good faith to address the pervasive legal violations discussed herein, including the rampant sexual harassment and discrimination against female employees, the unlawful retaliation against female employees who complained about the harassment, and false statement approved by the Board regarding diversity and inclusion at the Company.   Accordingly, Defendants Fayard, Pizula, and Selati face a substantial likelihood of liability and cannot impartially consider a demand. Therefore, demand is excused with respect to these defendants.

268.   Furthermore, the Director Defendants were on the Board during the relevant period, and thus were exposed to and had knowledge of the "red flags" alleged herein regarding unlawful harassment and discrimination and failure to abide by the Company's stated policies to promote diversity. The directors' inaction in the face of red flags subjects them to a substantial likelihood of liability for their conduct and, therefore, demand is excused.

269.   The Board is likewise conflicted from and unable to pursue

SHAREHOLDER DERIVATIVE COMPLAINT

Monster's claims against members of the Company's management, including Defendants Sacks and Schlosberg.  Any effort to prosecute such claims against these Defendants for their direct roles in implementing a business strategy designed to ignore or otherwise circumvent federal and state laws prohibiting discrimination would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Board had been on notice of the wrongdoing, any effort by the Board to hold Defendants liable would surely lead these executives to defend on the ground that their own conduct was consistent with Monster's corporate policy and practice, as established by and known to the Board.

### C. The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith

270.   Under Delaware law and Monster's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance. This is particularly true when such compliance concerns a core operation of the Company such as its employment practices. Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight. The entire Board was obligated to oversee the Company's risk, including potential liability for Monster's violations of federal and state laws regarding sexual harassment and discrimination. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

SHAREHOLDER DERIVATIVE COMPLAINT

271.   All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with — but consciously ignored (and/or perpetuated) — substantial "red flag" warnings that Monster was discriminating against women, Blacks and other minorities with respect to hiring, promotion, and evaluation of Board candidates.  The Board also knew that the Company's workforce has consistently only had a very small percentage of African American workers, and no African Americans in leadership positions.  The Board was also aware of other systematic gender discrimination at Monster, as reflected in at least five (5) lawsuits filed against the Company by former female employees detailing disgusting and abusive behavior toward women by male executives.

272.   These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties, and numerous lawsuits.  They have also resulted in severe harm to the Company's business reputation. Since the wrongdoing and harm alleged in this Complaint flows directly from the Board's conscious decision to permit the sustained and systemic violations of law in question, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Defendants is appropriate.

## X.   CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–10

273.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

274.   The Individual Defendants and Does 1–10 owed and owe the

122

SHAREHOLDER DERIVATIVE COMPLAINT

Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

275.  The Individual Defendants and Does 1–10, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

276.  As a direct and proximate result of the Individual Defendants' and Does 1–10's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–10

277.  Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

278.  Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

279.  The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

280.  Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of

SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duty, which were and are continuing, as set forth in particularity herein.

281.   The Company was injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**Abuse of Control**
**Against all Defendants**

282.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

283.   By virtue of their positions and financial holdings at Monster, the Director Defendants exercised control over Monster and its operations, and owed duties as controlling persons to Monster not to use their positions of control for their own personal interests and contrary to Monster's interests.

284.   Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

285.   As a result of Defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–10**

286.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

287.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

SHAREHOLDER DERIVATIVE COMPLAINT

288.   During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

289.   Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

290.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT V**

**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Against All Director Defendants**

291.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

292.  SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by
> means of any proxy statement form of proxy, notice of meeting
> or other communication, written or oral, containing any

125

SHAREHOLDER DERIVATIVE COMPLAINT

statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

293.   Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2019 and 2020 Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board and to approve "say on pay" executive compensation proposals.

294.   The 2019 and 2020 Proxy Statements were false and misleading because, among other things, they omitted and failed to disclose:

(a)   That the statement in the Proxies that "the Nominating and Corporate Governance Committee considers the experience, knowledge, skills, expertise, diversity, personal and professional integrity, character, business judgment, time available in light of other commitments and dedication of any particular candidate, as well as such candidate's past or anticipated contributions to the Board and its committees so that the Board includes members, where appropriate, with diverse backgrounds, knowledge and skills relevant to the business of the Company" was misleading because it suggested that the Company was actively seeking to achieve racial and ethnic

SHAREHOLDER DERIVATIVE COMPLAINT

diversity in its Board membership, while the undisclosed reality is that Monster either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool;

(b)     That the Company does not have term limits due to a desire to retain the experience of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c)     That the Company's failure to disclose its median salary and pay/employment data is due to a desire to conceal existing, known pay disparity at the Company which adversely affects women and minorities;

(d)     That the Company's executive compensation decisions do not take into consideration in any way the executives' success or lack thereof in achieving the Company's diversity and inclusion goals; moreover, that the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with, and that the Company's executives were retaliating against female employees such as  Jamie Hogan and Fran Pulizzi;

(e)     That the Board's Nominating and Governance Committee did not take racial and ethnic diversity into consideration when nominating Board candidates and instead simply sought to create a false appearance of seeking diversity among potential Board candidates;

(f)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to

127

protect women and minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

(g)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to sexual harassment, diversity and inclusion were being complied with;

(h)     That the statement in the Proxies that "*The Compensation Committee annually evaluates risks and rewards associated with the Company's overall compensation philosophy and structure and does not believe the program promotes excessive risk-taking*" was false and misleading. Because the undisclosed truth was that the Compensation Committee did not factor legal compliance into its compensation decisions, the Company's executive compensation program necessarily entailed excessive risks since the Company's executives were motivated to boost financial performance at any cost and regardless of legal compliance; and

(i)     That the Company's diversity and inclusion programs were not achieving measurable and actionable results, and needed substantial improvement.

295. Defendants' statements and omissions in the Proxies were material.   A company's statements about Board diversity are highly

SHAREHOLDER DERIVATIVE COMPLAINT

material to investors.[71]

296.   By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board and vote in favor of executive compensation proposals.

297.   Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2018, 2019 and 2020 annual meetings.  Plaintiff does not seek any monetary damages for the proxy law violations.

298.   This action was timely commenced within three years of the date of the 2019 and 2020 Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A.      Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the

---

[71] *See* Arleen Jacobius, "Calpers Turns Focus to Board Diversity in Proxy Voting," PENSIONS & INVESTMENTS, Sept. 17, 2018 (in 2018, Calpers voted against 438 directors at 141 different companies based on the companies' failure to respond to Calpers' efforts to increase board diversity).

SHAREHOLDER DERIVATIVE COMPLAINT

Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(1)     Monster should establish the position of a Chief Diversity Officer who reports directly to the Board;

(2)     At least one of Monster's directors should immediately resign prior to the Company's annual meeting set for April 2021 and a Black person nominated to the Board at that time. Thereafter, within a year and prior to the next annual meeting at least one other person from an underrepresented community should be nominated to the Board;

(3)     All Director Defendants named in this suit should return all of their 2020 compensation received from Monster (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Blacks and minorities in corporate America;

(4)     Monster should agree to publish an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Monster;

SHAREHOLDER DERIVATIVE COMPLAINT

(5)     Monster should create a $800 million fund to hire Blacks and minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at Monster for minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6)     Monster should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(7)     Monster should establish a Board-level Diversity Equity and Inclusion Council; and

(8)     Monster should immediately set specific goals with respect to the number of Blacks and minorities to hire at the Company over the next five years, and Monster should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Monster has an effective remedy;

D.     Awarding to Monster restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

SHAREHOLDER DERIVATIVE COMPLAINT

1        E.    Awarding punitive damages at the maximum amount permitted

2    by law;

3        F.    Awarding to Plaintiff the costs and disbursements of the action,

4    including reasonable attorneys' fees, accountants' fees, experts' fees, costs,

5    and expenses; and

6        G.    Granting such other and further relief as the Court deems just

7    and proper.

8    **DEMAND FOR JURY TRIAL**

9        Plaintiff, on behalf of Monster, hereby demands a trial by jury of all

10   issues that are subject to adjudication by a trier of fact.

11

12   Dated:  September 18, 2020                Respectfully submitted,

BOTTINI & BOTTINI, INC.
13   Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
14   Anne Beste (SBN 326881)

15   _____
    s/ Francis A. Bottini, Jr.
16       Francis A. Bottini, Jr.

17    7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
18   Telephone: (858) 914-2001
Facsimile:  (858) 914-2002
19   Email: fbottini@bottinilaw.com
    achang@bottinilaw.com
20       abeste@bottinilaw.com

21   RENNE PUBLIC LAW GROUP
Louise H. Renne (SBN 36508)
22   Ruth M. Bond (SBN 214582)
Ann M. Ravel (SBN 296182)
23   350 Sansome Street, Suite 300
San Francisco, CA 94101
24   Telephone:  (415) 848-7200
Facsimile:   (415) 848-7230
25   Email:lrenne@publiclawgroup.com
rbond@publiclawgroup.com
26   ann.ravel@gmail.com

27   *Attorneys for Plaintiff Frank Falat*

28
132

SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: 25C1191B-CD84-40D7-A9D4-44404F4E845D

## VERIFICATION

I, Frank Falat, verify that I am a shareholder of Monster Beverage Corp.   I have

reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those

allegations of which I have personal knowledge, I believe them to be true; as to those

allegations of which I lack personal knowledge, I rely upon my counsel and counsel's

investigation, and believe them to be true.  Having received a copy of the complaint and

reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____9/16/2020 | 2:59 PM PDT____.

_____   _____   _____

Frank Falat